UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth J. BRYZA,
Defendant-Appellant.

Nos. 75–1215 to 75–1218.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1975.

Decided Aug. 25, 1975.

Rehearing and Rehearing En Banc
Denied Feb. 12, 1976.

James P. Chapman, Gerald F. Murray, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Gary L. Starkman, Ann C. Tighe, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before MOORE, Senior Circuit Judge,* and CUMMINGS and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant, Kenneth J. Bryza, was charged in four separate indictments with violations of the mail fraud statute, 18 U.S.C. § 1341.[1] In one of the indictments he was also charged with using a false name to carry out a mail fraud scheme in violation of 18 U.S.C. § 1342.[2] In substance each of the four indictments alleged that the defendant, while acting as a purchasing agent for International Harvester Company (hereinafter referred to at times as "I–H"), accepted payments from various outside salesmen and suppliers[3] of I–H in viola-

---

* The Hon. Leonard P. Moore, Senior Circuit Judge, Second Circuit, is sitting by designation.

1. 18 U.S.C. § 1341 states, *inter alia*:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. 18 U.S.C. § 1342 states:

"Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

3. The outside suppliers and salesmen were also indicted with Bryza. The first indictment, 74 CR 433, contained eleven counts and named only Bryza. The second indictment, 74 CR

tion of the company's conflict of interest policy. These payments were channelled to the defendant through Searsport Company, an entity organized by the defendant specifically for that purpose. The government contended that as a result of these payments to Bryza, I–H was deprived of its rights to have its business conducted in an honest manner, to the loyal, faithful and honest services of its employee Bryza, and to the secret profits Bryza received. Following a jury trial, Bryza was convicted on all remaining counts in all four indictments.[4] The trial judge imposed concurrent one year terms of probation. As a special condition of probation, Bryza was ordered to serve the first 177 days in the custody of the Attorney General.

## I. PERSONS AND PARTIES INVOLVED IN THE ALLEGED MAIL FRAUD SCHEME.

Defendant Bryza has been employed in the corporate purchasing field for the past sixteen years. Since December, 1966, Bryza has been employed by International Harvester in the capacity of a buyer in the central purchasing department. His responsibilities included negotiating contracts with suppliers, placing business, evaluating sources, overseeing the services of suppliers and the quality of their products, and working with the engineering department to ensure that purchased products met company specifications. During the time he worked at International Harvester Bryza also taught a course at Northwestern University School of Business.

On the average, the defendant was responsible for approximately 175 contracts. He purchased from $35 to $40 million in goods per year from sources throughout the country. Before any buyer could approve a purchase, there had to be a formal requisition from one of the many plants Harvester maintained across the country. When such a requisition came in, it became the responsibility of the particular buyer for that item to secure a source. If the part requested had a specific mechanical function (most of the items Bryza bought had such a function), the requisition was normally accompanied by blueprints from the I–H engineering department. It was often the case that a particular supplier had been classified as an "Approved Source" by I–H engineering. The notation "Approved Source" would appear on the blueprint and in such a situation the buyer had no choice but to purchase from that particular source.

In other circumstances, the buyer was to send the blueprints and seek quotations from one or more potential suppliers whom he knew to be capable of producing the product sought. If more than one supplier submitted a bid, the buyer would then evaluate them based on past history of sales, quality, price and delivery capabilities. The buyer's performance was continually supervised and critiqued by the various departments placing the orders and by his own superiors.

## A. PAYMENTS FROM MARVIN NATHAN

Marvin Nathan first met the defendant in 1967. At that time, Nathan was the sales representative of the Albany Chicago Corporation and he called on Bryza in an attempt to secure more sales for Albany Chicago to International Harvester. According to the defendant, Nathan was an excellent manufacturer's representative and because of this, Bryza recommended Nathan to the Tenna Corporation and to the Hallmark Company, I–H suppliers, who at the time were

---

437, contained thirteen counts and named Bryza and Max Selzer. Selzer pled guilty, received three years probation, and a $1,000 fine on four counts. The third indictment, 74 CR 438, contained ten counts and named Bryza and Yeadon D. Mason. Mason was subsequently acquitted in a jury trial. The fourth indictment, 74 CR 439, contained thirteen counts and named Bryza and Marvin B. Nathan. Nathan, like Selzer pled guilty and received three years probation and a $1,000 fine on five counts.

4. Prior to trial, counts six through thirteen of indictment 74 CR 437 were dismissed by the government.

looking for a sales representative in the Chicago area.

Over the next several years, Nathan and Bryza saw each other frequently. In December of 1969 they had a luncheon meeting. During the course of the meeting they reached an agreement whereby Bryza would receive a certain percentage of Nathan's commissions in return for aiding Nathan in obtaining two accounts and than watching over them. These payments were to be paid to Bryza through a separate entity called Searsport Company. The evidence is in dispute as to whether Bryza or Nathan suggested the idea of an independent phony consulting company to wash the payment monies. It is clear that Nathan supplied all of the stationery for Searsport. However, Bryza himself took all the initial steps to set up Searsport Company.

In January, 1970, Bryza applied for and received Post Office Box 662, Arlington Heights, Illinois, in the name of the Searsport Company. Shortly thereafter, on February 21, 1070, Bryza opened a checking account for Searsport at the Schaumberg State Bank, Schaumberg, Illinois. The persons authorized to sign on that account were Bryza and "Charles W. Morgan," [5] a name adopted by Bryza.

In February, 1970, Bryza asked Nathan for an advance payment in the amount of $500. Accordingly, on February 3, 1970, Nathan complied with the demand by paying Bryza $500 by a check made payable to the Searsport Company. After the first payment was made in February, 1970, Nathan continued until July, 1973 to make payments to Bryza on the commissions Nathan received from the Tenna and Hallmark accounts.

The Tenna and Hallmark accounts were not the only accounts on which Nathan made payments to Bryza. In May or June, 1971, Nathan and Bryza had a conversation about the Albany-Chicago

Company, which, like Tenna and Hallmark, was an I–H supplier and for which Nathan was a manufacturer's representative and Bryza was the I–H purchasing agent. At that time, Bryza told Nathan to retroactively compute the commissions Nathan had earned from January, 1970 to June, 1971, on the Albany-Chicago account and to pay Bryza a portion of those commissions. Nathan agreed to the arrangement and made the requested payment to Bryza through Searsport. Thereafter, from June, 1971 to July, 1973, Nathan made regular payments to Bryza on the Albany-Chicago account. Additionally, Nathan began making payments to Bryza on one other account—the Bulk Packaging Company account—in the spring of 1971.

From January, 1970 to July, 1973, Nathan paid Bryza, through Searsport, a total of $18,000. Nathan showed those payments on his company books as consulting fees. However, neither he, his companies, nor the companies he represented ever received any consulting services from Bryza, Searsport or "Charles W. Morgan.". Rather, in Nathan's view, the payments ensured that he could continue to do business with I–H through Bryza.

Marvin Nathan was indicted with the defendant in case No. 74 CR 439. Although he testified that at the time he was involved in the transactions with Mr. Bryza, he did not believe he was engaged in any fraudulent conduct and was not aware that he may have been violating the law, he pleaded guilty to the charges and was sentenced to a term of probation plus a fine.

Nathan further stated that in the year since International Harvester uncovered Bryza's conduct and fired him, Nathan's business with I–H had doubled.

## B.  PAYMENTS FROM MAX SELZER

Max Selzer had been the president of Selzer-Ivice Sales, a manufacturer's representative company, since 1971. Selzer-

---

5. In his brief, Bryza admits that the name "Charles W. Morgan" was taken from a New England whaling ship. Bryza adopted this pseudonym for use in operating Searsport. It is clear that there is no other party involved in this case called Charles W. Morgan.

Ivice represented a company called Airtex Products which had approximately $400,000.00 worth of sales per year to International Harvester.

In approximately mid-year, 1970, Selzer and Bryza had a luncheon meeting. During the luncheon, Bryza mentioned that he was working for I–H for under $11,000 per year and he further noted that manufacturer's representatives made a great deal of money. Approximately one month later, at another luncheon meeting between Bryza and Selzer, Bryza again stated that his I–H yearly salary was under $11,000. He also mentioned that other companies were making efforts to secure the I–H account which Airtex then enjoyed. Selzer responded that he was very grateful to have Bryza's good will and wanted to work out some plan to remunerate Bryza.

Approximately two weeks later, Bryza and Selzer had another luncheon date. During the luncheon, Selzer said that he had worked out a plan of remuneration and he offered to pay Bryza one-half of one percent of the commission he received for selling Airtex products to I–H. Bryza accepted the proposal and suggested that the monies be paid to him as consultation fees. Bryza said he would contact Selzer later to advise him as to how the payments should be made. Several weeks later, Bryza called Selzer and told him that the payments should be made to the Searsport Company. In March, 1971, Selzer made his first payment to Bryza, through Searsport, and he continued to make the payments until August, 1973.

During the period from 1971–1973 Selzer paid approximately $4,500 to the Searsport Company. This amount represented the agreed upon percentage of the commissions Selzer-Ivice was receiving from Airtex Products.

From 1969 through 1973 the volume of business Airtex did with International Harvester remained relatively constant. According to Selzer, "we gave them the very best value that we could." The payments to Bryza apparently had no effect on increasing the sales to I–H. Selzer made other attempts to sell other products to International Harvester through Bryza but was unsuccessful in getting any further business.

Selzer believed that Bryza always acted in a very professional manner and described the defendant as a "good buyer". Selzer did not believe that his conduct was illegal and thought that he was acting in an honorable way. When Bryza and Selzer reached agreement on the payments, Selzer requested and received the defendant's social security number so that he could prepare the proper tax forms. He acted in this manner because, in his own words, "I did not want to be involved in any illegal activities."

Max Selzer was indicted with the defendant in case No. 74 CR 437. In return for his guilty plea and his cooperation with the government concerning other purchasing agents Selzer was paying, the prosecution recommended that he not be imprisoned. He received three years probation and a $4,000 fine.

Selzer-Ivice remains as the manufacturer's representative for Airtex Products in their dealings with International Harvester.

## C. PAYMENTS FROM THE E.N.M. COMPANY AND THE POLYDORIS BROTHERS.

The E.N.M. Company, owned and run by three brothers, Nicholas, Stewart and Louis Polydoris, sold one of its products to I–H during the 1960's. In late 1969 or early 1970, Louis Polydoris began to call on Bryza at I–H rather frequently because he hoped to sell to I–H, through Bryza, a second E.N.M. product.

In the spring or summer of 1970, Louis Polydoris offered Bryza a gift of two airline tickets to Las Vegas. Bryza took the tickets, but approximately a week later, he told Polydoris that he had tried to turn the tickets in for cash and had been unsuccessful. Polydoris said he would arrange to get cash for the tickets. A week later, Polydoris gave Bryza an envelope containing $500 in cash,

stating that the money was cash from the airline tickets.

In the late summer or early fall of 1970, Bryza and Louis Polydoris met after work for a drink in a bar. During that meeting, Bryza stated that it was time E.N.M. Company had someone at I–H looking out for E.N.M.'s affairs and acting as E.N.M.'s agent. Bryza then asked to be paid five percent of E.N.M.'s total sales to I–H. Polydoris responded that five percent was not built into the price of the products E.N.M. was selling to I–H and thus the proposed plan was unworkable. Bryza then suggested that Polydoris could increase by $1.00 per unit the previously quoted price of the second E.N.M. product—a service recorder—which I–H was going to purchase. Bryza asked that the additional $1.00 per unit be paid to him. However, Polydoris responded that that plan also was unworkable because it would be impossible to change the previously quoted price. Bryza then said that a payment plan was possible because he had a company to which payments could be made and that I–H could not trace the payments to him. Polydoris promised to look into the possibility of making payments in some form and told Bryza that he would get in touch with him later.

A day or two later, Polydoris telephoned Bryza at I–H. During that conversation, it was agreed that Bryza would send an invoice for $100 from Searsport. Shortly thereafter, Polydoris received the invoice which stated that it was for consulting services for November, 1970. It was signed by Charles W. Morgan. Polydoris authorized payment.

Subsequently, the Polydoris brothers received regular invoices from Searsport and as a result, the company owned by the brothers paid Bryza, through Searsport, $125 per month until April, 1971.

In approximately May, 1971, Bryza and Louis Polydoris had a telephone conversation in which Bryza stated that the $125 monthly payments were no longer acceptable and that he felt the Polydoris brothers should reconsider his previously suggested plan of paying five percent of

E.N.M.'s total dollar sales to I–H. Polydoris said that he would contact Bryza later. Louis Polydoris then transferred the Searsport account to his brother, Stewart Polydoris.

In September or October, 1971, Stewart Polydoris first met Bryza at a luncheon meeting. During the meeting, Bryza stated that the $125 monthly payments no longer were acceptable and he again demanded to be paid five percent of E.N.M.'s total sales to I–H. Stewart Polydoris refused to pay Bryza five percent of the total sales, but did agree to increase the payments to $250 per month. The Polydoris brothers subsequently began to make monthly payments of $250 to Bryza through Searsport.

In May, 1973, the Polydoris brothers received an invoice from Searsport which stated that their account was delinquent and payment was requested. After receipt of the invoice, Louis Polydoris authorized a single $250 payment to Searsport although the invoice showed that $775 was past due. Accordingly, the Polydoris brothers received a letter from Searsport, dated May 29, 1973 and signed again by Charles W. Morgan, which stated that, because the account was delinquent, the Searsport consulting services would be terminated.

The Polydoris brothers paid Bryza, through Searsport, a total of approximately $6,000. However, no consulting services or any other services were rendered in return for the payments. In Louis Polydoris' view, the payments were made to ensure continued business with I–H.

There was a substantial dispute concerning the start of the payments to Bryza. According to the Polydoris brothers the money was coerced from them. According to the defendant, the payments were a mutually agreed upon arrangement with no pressure or coercion involved. Sometime in the spring of 1973, Nicholas Polydoris, the president of E.N.M., apparently learned of the payments for the first time. He brought

this information to the attention of International Harvester.

## D. PAYMENTS FROM THE BARTSCH TOOL AND SCREW COMPANY

The president of Bartsch Tool was Mr. Yeadon D. Mason, who was indicted with the defendant in case No. 74 CR 438.[6] Mason did not testify at this trial. Bartsch Tool was a small company which sold approximately $40,000 to $50,000 of merchandise to International Harvester per year.

The evidence against the defendant on this charge came from Mason's secretary, Mrs. Audrey Pulford. She testified that payments were made by Bartsch Tool to Searsport. Although she did not know the specifics, she was told that the payments were for consulting services provided by the defendant. The only other direct evidence concerning Bryza's relationship with Bartsch Tool came from the defendant. From January, 1972, to August, 1973, Bartsch received monthly invoices of $125.00 from Searsport. Payments were sent to cover the invoices. Bartsch received no apparent consulting services.

## E. DEFENDANT'S DISMISSAL FROM INTERNATIONAL HARVESTER

In 1961, the Board of Directors of I–H adopted a conflict of interest policy. Under the policy, the company's expectation of the complete and undivided loyalty of its employees to the company was set forth. Additionally, the policy listed certain activities or interests which were considered to be in conflict with the interests of the company.[7]

Each year, in the month of January, every officer and management employee of I–H was required to sign a card stating that he understood I–H's policy and that he had no conflicts with or exceptions to it. In the event any employee believed that he had a conflict, he was required to submit the details. The I–H law department reviewed the details and a decision was then made as to whether or not a conflict existed, and, if so, what action was required.

Bryza was one of the I–H employees who was required to sign a conflict of interest card.

In the summer of 1973, International Harvester was informed by Nicholas Polydoris of the E.N.M. Company that they had been making payments to Kenneth Bryza. After some initial investigation by Mr. Gordon Lane, the I–H manager of auditing and Mr. Robert Parker, the director of purchasing to confirm the payments, Bryza was confronted. Some time prior to the confrontation, Mr. Lane had been in charge of an audit of the purchasing department. This audit concluded that all of the contracts Bryza handled were proper and that there was no evidence to indicate that the company was not getting a full measure of service from him.

Upon receipt of this information from E.N.M., Lane and Parker called Bryza in and asked him about it. The defendant falsely denied knowing anything about the Post Office box, the Searsport Company or Charles W. Morgan. Bryza also falsely denied having received payments from suppliers.

At that point Bryza was reminded of the company's conflict of interest policy and summarily discharged. His person-

---

**6.** Mason and Bryza were indicted together, but Judge Marshall severed Mason's case from Bryza's other cases which were pending before Judge Austin. Mason was subsequently acquitted.

**7.** The prohibited activities or interests included:

"For an employee to seek or accept or to offer to provide directly or indirectly from or to any individual, partnership, association,

corporation or other business entity or a representative thereof doing or seeking to do business with the company, or any affiliate of the company loans, except with banks or other financial instructions, services, payments, excessive entertainment and travel, vacation or pleasure trips, or any gift of more than nominal value or gifts of money in any amount."

nel record stated that he was terminated for a conflict of interest. International Harvester has never made any demands on the defendant that he pay to them any of the monies he received through Searsport.

International Harvester has not taken any action against any of the suppliers who were making payments to Bryza. They continue to purchase from these same suppliers and do business with the manufacturer's representatives at about the same level as before. Indeed, as far as Marvin Nathan is concerned, his business with International Harvester has doubled.

## II. THE DEFENDANT HAD THE REQUISITE SPECIFIC INTENT TO COMMIT AN OFFENSE UNDER THE MAIL FRAUD STATUTE.

Mail fraud, like all other crimes arising out of deceit or deception, requires a specific criminal intent. The burden is on the government to establish beyond a reasonable doubt that the defendant not only knowingly performed acts which the law forbids, but that he did the acts with intent to violate the law. Bryza argues that his conduct did not constitute a violation of the mail fraud statute because, in his view, International Harvester suffered no harm and he had no intent to defraud.

The mail fraud statute "is a broad proscription of behavior for the purposes of protecting society" *United States v. Owen*, 231 F.2d 831, 832 (7th Cir. 1956); *United States v. Sylvanus*, 192 F.2d 96 (7th Cir. 1951). Whether or not the defendant had the specific criminal intent to defraud is governed by the conduct and state of mind of the schemer rather than the objects of the scheme. In *United States v. Faser*, 303 F.Supp. 380 (E.D.La.1969), the defendants were charged with "depriving the State of Louisiana of the honest and faithful performance of their duties as public officials." The underlying scheme charged that the defendants had used their official positions to cause state funds to be deposited into non-interest bearing accounts in exchange for a kickback from the depository bank. Asserting that state funds were not required to be, nor were in fact, placed in interest bearing accounts, defendants argued that no criminal scheme was charged because of the absence of an ⸀allegation that the state was deprived of "anything of value which could be measured in terms of money or property" (303 F.Supp. at 383).

The court employed a dual analysis to reject this contention. First, it held that, on the basis of familiar agency principles, the amount of the kickback received by defendants belonged to the state and, therefore, the indictment charged, both expressly and by implication, that the state was defrauded out of a sum certain. Secondly, and of particular applicability here, the court recognized that, even in the absence of an object susceptible to measurement in terms of money or property, a mail fraud violation can be asserted where "a person defrauds the State out of the 'loyal and faithful services of an employee.'" Id. at 384.

The faithful services rationale is applicable to the instant case and has found support in a variety of different factual situations. For example, in *United States v. Proctor & Gamble Co.*, 47 F.Supp. 676 (D.Mass.1942), defendant companies were charged with obtaining confidential information from employees of a competitor. Upholding the viability of a mail fraud prosecution, the court focused not upon the property right represented by the information, but upon the deprivation of the employees' loyal services:

> "When one tampers with [the employer-employee] relationship for the purpose of causing the employee to breach his duty he in effect is defrauding the employer of a lawful right. The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests" 47 F.Supp. at 678.

■ *United States v. George,* 477 F.2d 508 (7th Cir.), *cert. denied* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973) is directly analogous to the instant case and supports the notion that a deprivation of an employee's loyal services can amount to actual fraud under the mail fraud statute. There, three defendants were indicted for substantive mail fraud violations arising from a scheme in which Yonan, a buyer for Zenith Radio Corporation received kickbacks from Greenspan, a supplier, through middleman George. "The indictment alleged that the scheme deprived Zenith of its lawful money and property and of the honest and faithful performance of its employee Yonan's duties" (477 F.2d at 510).

■ Because the jury in *George* had been instructed that a knowing interference with the employer-employee relationship for the purpose of depriving an employer of his employee's honest and faithful services could amount to criminal fraud, this Court on appeal was compelled to reach the merits of the "honest and faithful services" issue. Upholding the instruction, Judge Cummings' opinion recognized that either the deprivation of honest and faithful services occasioned by the acceptance of secret profits or fraudulent activities to the actual detriment of the employer sufficed under the statute. In this case defendant Bryza's failure to disclose his receipt of kickbacks and consulting fees from International Harvester's suppliers resulted in a breach of his fiduciary duties depriving his employer of his loyal and honest services. Bryza's specific intent is manifested by the actions he took in preventing his employer and others from discovering this breach of his fiduciary duty. Bryza assumed a bogus name, "Charles W. Morgan," formed a phony company, and lied on his annual company statement that he had no conflict of interest. Whether or not Bryza had a specific criminal intent to defraud is clearly demonstrated by these overt acts to defraud. Simply because the employer, International Harvester, took no retributive action against the defendant does not mean that no crime was committed. Bryza argues that I–H suffered no harm and in fact still does business with the other parties who were indicted as a result of this scheme to defraud. However, as this Court stated earlier the defendant's intent must be judged by his actions, not the reaction of the mail fraud victims. International Harvester's decision not to take legal steps against Bryza and to maintain its business relationship with some of the other parties involved is probably based on a myriad of complex factors—both business and legal in nature. Nevertheless, it is clear that International Harvester was deprived of Bryza's honest and faithful services in addition to the right to make the best possible purchase. Although Bryza argues he obtained the best possible contracts for his employer, I–H was entitled to negotiate those purchases with the knowledge of its employee's interest. Thus, even though I–H was satisfied with Bryza's job performance and the products he purchased for I–H from its suppliers, and despite the fact that no preferential treatment, beyond receiving business, was accorded the suppliers, that the suppliers' prices to I–H were fair and reasonable, that I–H was never shown to be dissatisfied with the suppliers' prices or products, and that Bryza insisted upon efficiency, quality and fair prices from the suppliers, Bryza's conduct nonetheless falls within the purview of the mail fraud statute. The fraud consisted in Bryza's holding himself out to be a loyal employee, acting in I–H's best interests, but actually not giving his honest and faithful services, to I–H's real detriment. See *United States v. George (supra); United States v. Faser (supra); United States v. Barrett,* 505 F.2d 1091 (7th Cir. 1974); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir. 1974).

We believe that the evidence established that Bryza's course of conduct amounted to an actual, rather than a constructive, fraud. By his own nefarious activities, the solicitations, the setting up of Searsport, the use of the alias Charles Morgan, the deceitful conflict of

interest statements, Bryza was able to defraud International Harvester of his loyal and faithful services. In our opinion his actions clearly show a specific intent and fall within the prohibition of the mail fraud statute.

### III. THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY THAT THE LAW PRESUMES THAT EVERY PERSON KNOWS WHAT THE LAW FORBIDS.

Under our system of jurisprudence it has long been well established that every man is presumed to know the law. This principle stems from a common law inference of long-standing acceptance,[8] and is founded in the common sense concept that without it "[N]o penal law could be enforced, because there is no penal law a knowledge of which, by a due degree of self-stupefaction, could not be precluded." 1 F. Wharton, Criminal Law § 102 at 142 (12th Ed.1932).

In this case the trial court instructed the jury that the government had the burden of proving a specific intent on the part of the defendant to commit the crime but also that the defendant would be presumed to know what the law requires and forbids unless outweighed by evidence to the contrary.[9] Bryza contends that those instructions had the effect of reducing the government's burden of proving intent citing *Mann v. United States*, 319 F.2d 404, 409 (5th Cir. 1963); *United States v. Woodring*, 464 F.2d 1248, 1251 (10th Cir. 1972); and *Johnson v. United States*, 348 F.2d 772 (D.C.Cir. 1965). We have reviewed the cases cited by the defendant and believe that the instructions involved in those

---

**8.** See *United States v. Murdock*, 290 U.S. 389, 393–396, 54 S.Ct. 223, 224–226, 78 L.Ed. 381 (1933); *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68, 30 S.Ct. 663, 666, 54 L.Ed. 930 (1910); *Williamson v. United States*, 207 U.S. 425, 453, 28 S.Ct. 163, 173, 52 L.Ed. 278 (1907); *Turf Center Inc. v. United States*, 325 F.2d 793 (9th Cir. 1963); *Reyes v. United States*, 258 F.2d 774, 775, 782–784 (9th Cir. 1958); *Elwert v. United States*, 231 F.2d 928, 937 (9th Cir. 1955); *Finn v. United States*, 219 F.2d 894, 899–900 (9th Cir. 1955). Cf. *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). Accord, LaBuy, Manual on Jury Instructions, Section 5.06–2.

*Cohen v. United States*, 378 F.2d 751, 756–757 (9th Cir. 1967), *cert. denied* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215; *Edwards v. United States*, 334 F.2d 360, 366–368 (5th Cir. 1964), *cert. denied* 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702.

Cf. *United States v. Miller*, 379 F.2d 483 (7th Cir. 1967), *cert. denied* 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281.

**9.** The court charged the jury that:

"Before a defendant may be found guilty of a crime, the prosecution must establish beyond a reasonable doubt that under the statute defined in these instructions the defendant was forbidden to do the act charged in the indictment and that he intentionally committed the act.

Now, the crime charged in this case requires proof of specific intent before the defendant can be convicted. 'Specific intent,' as the term implies, means more than the general intent to commit the act. To estab-

lish 'specific intent' the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined by you from all of the facts and circumstances surrounding this case.

Now, the defendant has offered evidence that he did not know that his conduct was unlawful. Unless outweighed by evidence to the contrary, the law presumes that every person knows what the law forbids and what the law requires to be done.

As I told you before, 'specific intent' is an element of the crime charged in the indictment, therefore the evidence that the defendant acted because of ignorance of the law is to be considered by you in determining whether or not the defendant acted with the required specific intent.

Now, the defendant in a criminal case, as I told you at the outset, is presumed by law to be innocent. That presumption remains with him throughout the trial unless and he is proven guilty of the crime charged by credible evidence beyond a reasonable doubt.

As I told you at the outset of the trial, the burden of proving the defendant guilty beyond a reasonable doubt rests upon the government. This burden never shifts throughout the trial. The law does not require a defendant to prove his innocence or to produce any evidence. He may rely upon evidence brought out on cross examination of witnesses for the government, and if the government fails to prove the defendant guilty beyond a reasonable doubt, it is your duty under those circumstances to acquit him."

cases differ markedly from those in the instant case. The propriety of the knowledge of the law instruction cannot be viewed in isolation but must be considered with the other charges instructing the jurors that the burden of proof never shifts from the government. *Cupp v. Naughton*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Bessesen*, 445 F.2d 463, 468 (7th Cir. 1971).

■ Thus, the instructions about which Bryza complains properly were accompanied by an instruction to the jury that they had to find that the defendant acted with specific intent, and the concept of specific intent was fully explained, as were the terms "knowingly," "willfully" and "intent to defraud". Furthermore, the jury was fully instructed that it could consider the defendant's evidence that he acted because of ignorance of the law in determining whether he acted with the requisite specific intent. Finally, the jury was clearly told that the burden of proof rests upon the government, that it never shifts to the defendant, that the law does not require a defendant to prove his innocence or produce any evidence and that it was the jury's duty to acquit if the government failed to prove the defendant guilty beyond a reasonable doubt. We find no error in the instructions dealing with the defendant's specific intent and the presumption of knowledge of what the law requires and forbids.

## IV. ADMISSION OF FACT THAT BRYZA'S CO–DEFENDANTS HAD PLED GUILTY WAS NOT IMPROPER UNDER THE CIRCUMSTANCES.

■ Over the defendant's objection the court permitted witness Nathan and witness Selzer to testify that they had pled guilty to the same charges for which Bryza was being tried. Prior to the testimony of Selzer and Nathan, the defendant moved to exclude any testimony concerning their pleas of guilty and their subsequent convictions and sentences. In making the motion *in limine* the defendant agreed to give up his right to cross-examine the witnesses concerning their pleas and therefore not to make any attempt to impeach their credibility by bringing out the convictions during cross-examination. The trial judge denied the motion. The trial judge was correct in denying the motion because defense counsel had previously brought out during the examination of Stewart Polydoris that Polydoris was involved in the scheme but not indicted.[10] As a result of this examination, the fact that the Polydoris brothers were named in the same indictment charging Bryza, but were not prosecuted for the offenses set forth therein, was clearly brought to the attention of the jurors. Thus defense counsel opened the door to the subject as a result of his cross-examination of Stewart Polydoris. Had the information that Selzer and Nathan were charged and convicted not been brought

**10.** During the cross-examination of government witness Stewart Polydoris by counsel for Bryza, the following colloquy occurred:

"Q. Now, by the way, do you know that the government has charged in the indictment here that you and your brother Louis entered into an illegal scheme with Mr. Bryza? Are you aware of that, sir?

A. Apparently that is correct.

Q. You are aware of that, is that correct?
A. Yes, sir.

Q. All right, and as a matter of fact, however, no criminal proceedings have been instituted by the government against you, your brother Nick, your brother Lou or the

E.N.M. Company or the Stevens Company, is that correct, sir?

A. Stevens Engineering Company?
Q. Yes, sir.
A. No.

Q. Is that correct, there has been no criminal proceedings against any of the people I have just named?

A. Not to my knowledge.

Q. And certainly if somebody instituted a criminal proceeding against you, you would be aware of it, is that correct—I will withdraw that, I am sorry.

A. Against me personally?
Q. You know of none?
A. No sir."

to the jury's attention, the plain inference which the jury would have been left to draw was that all parties to the charged scheme, save Bryza, were permitted by the government to go unpunished for their illegal activities. Thus, to foreclose the possibility that the jury might incorrectly believe that the government had singled out Bryza for prosecution and punishment, while permitting his co-schemers to go free, the testimony at issue properly was elicited.

■■■ Normally the fact that co-defendants have entered guilty pleas has no place in another defendant's trial. Guilty pleas of co-defendants should be brought to the attention of the jury in only certain narrow instances;[11] i. e., when it is used to impeach trial testimony or to reflect on a witness' credibility in accordance with the standard rules of evidence; where other co-defendants plead guilty during trial and are conspicuously absent; where opposing counsel has left the impression of unfairness which raises the issue or invites comment on the subject. In all of these situations the trial judge should give a cautionary instruction concerning the guilty pleas when he charges the jury. However, if the trial judge thinks that the admission of co-defendant's guilty pleas arose out of aggravated or egregious circumstances and that even the strongest curative instruction would be insufficient he can take more drastic action such as declaring a mistrial. Cf.: *United States v. Baete*, 414 F.2d 782 (5th Cir. 1969). In some cases this entire problem could be avoided by simply allowing counsel to bring out the fact that the co-defendants were indicted, thus avoiding the impression that the government is being unfair without telling the

jurors that the co-defendants had actually admitted their guilt.

In the instant case, the testimony of Selzer and Nathan regarding their guilty pleas was very brief, was not referred to after it initially was adduced, and each time the information was brought out, the jury was carefully instructed that the fact that the witnesses pled guilty was not to be considered as any evidence of Bryza's guilt. And during the charge to the jury, the court again instructed the jurors that:

"As I told you before, the fact that a co-defendant pleads guilty is not evidence of the guilt of this defendant or that the crime charged in the indictment was committed. The guilt or innocence of the defendant on trial must be determined by you solely by the evidence introduced in the trial of this case which has just concluded."

Accordingly, the defendant was fully protected against the possibility that the jury might consider the evidence of the guilty pleas in an improper manner.

## V. THE COURT PROPERLY INSTRUCTED THE JURORS CONCERNING AN EMPLOYEE'S DUTY OF DISCLOSURE AND CONFLICT OF INTEREST.

Defendant argues that the instructions given by the trial judge "all but told" the jurors to return a guilty verdict; that instructions 55 through 57 effectively destroyed Bryza's defense contentions—that there was no intent to defraud; that his activities did not amount to a "scheme to defraud"; and that he had no inkling that he was violating federal law.

■■■ We have reviewed the instructions[12] given and believe that they were

---

11. *United States v. Kahn*, 381 F.2d 824 (7th Cir. 1967); *United States v. Aldridge*, 484 F.2d 655 (7th Cir. 1973); *United States v. Harris*, 141 U.S.App.D.C. 253, 437 F.2d 686 (D.C.Cir. 1970); *United States v. King*, 505 F.2d 602 (5th Cir. 1974).

12. The instructions concerning duty of disclosure and conflict of interest were as follows:

"The defendant, as purchasing agent employed in the purchasing department of International Harvester Company had a duty to disclose and not to conceal facts known to him which he had reason to believe were material to the decisions of International Harvester Company in purchasing parts and equipment to be used by International Harvester Company and its wholly owned sub-

proper when considered in the total context of this case. The duty of disclosure instruction was predicated upon the *George* (*supra*) case which, as previously discussed, plainly includes a duty not to conceal facts known to him which he has reason to believe are material to the employer's conduct of its business and affairs. Bryza's duty of disclosure in this case was predicated upon the right of I–H, as set forth in its policy, to do business with its suppliers in possession of all relevant facts. Bryza's receipt of monies from I–H suppliers, while at the same time, he denied that he had any conflicts of interest, constituted material misrepresentations and involved the concealment of material facts which in and of themselves were violations of the mail fraud statute.

The duty of disclosure instruction did not, as Bryza contends virtually direct the jury to find him guilty. Rather, the instruction simply stated that the jury may find the existence of a scheme within the meaning of the mail fraud statute if it should find from all the evidence, that Bryza devised a plan in which he would breach his duty of disclosure. The instruction, moreover, must be considered in the context in which it was given. Viewing it together with the court's charge on specific intent, it clearly did not direct the jury to return a guilty verdict.

Finally, the court's instruction to the jury on the definition of a conflict of interest was quite proper. Throughout the trial of the case, the jury heard testimony regarding conflicts of interest. They had a right to know what the definition of that term was. The instant instruction did no more than explain in plain language the meaning of a conflict of interest.

Since the charge to the jury with respect to the meaning of a conflict of interest and Bryza's duty of disclosure accurately reflects the state of the law, and because the charge required a finding of specific intent to defraud as a prerequisite to a finding of guilt, no error can be attributed to the instructions here at issue.

Finally, the defendant offered four instructions which the trial court refused to give to the jury, i. e. (1) it was not per se illegal for Bryza to accept these payments, or (2) to use an assumed name; (3) that Bryza's entire employment relationship with I–H and (4) the quality and price of the items purchased could be considered on the issue of defendant's intent to defraud. Even assuming that there is nothing inherently wrong with these instructions, we do not believe that the trial judge's refusal to give the tendered instructions amounted to reversible error. The trial judge had observed the entire case before ruling on instructions. Thus we must rely on his discretion in refusing the instructions. Perhaps, as the government argues, the trial court believed that giving those in-

---

sidiaries in the manufacture of their products.

The fact that the defendant did not himself have responsibility for the purchasing of parts and equipment does not affect in any way his duty of disclosure.

If you should find, beyond a reasonable doubt, after considering all the evidence, that the defendant devised a scheme in which he would breach this duty of disclosure, then you may find that the defendant engaged in a scheme to defraud International Harvester.

A conflict of interest exists whenever an employee, in his capacity as an employee or in the performance of his duties, takes actions which have or predictably may have an effect on his personal financial interest con-

trary to or against the best interests of his employer.

The term 'actions' includes any direct or indirect personal participation in a decision, approval, disapproval, recommendation, or rendering of advice regarding a contract in which the employer has a financial interest.

A conflict of interest may be avoided or rectified if the employee fully informs his employer or the responsible officials of the corporation that employs him of the nature and circumstances of the matter and his personal financial interest in the matter and if the employer, having been fully informed, determines that the employee's interest is either not so substantial as to be improper or not likely to affect the integrity of the services which the employer expects from said employee."

structions would unduly single out and emphasize pieces of evidence. A review of the record shows that the trial court allowed Bryza to show his capable service to I–H, the high quality of goods received, and the alleged reasonableness of prices paid. Thus the proposed instructions would merely attempt to emphasize portions of the evidence rather than instruct the jurors as to the law. The court had the discretion to refuse the instructions. *Blauner v. United States*, 293 F.2d 723 (8th Cir.), *cert. denied* 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 193 (1938); *United States v. Terry*, 362 F.2d 914 (6th Cir. 1966); *United States v. Thomas*, 484 F.2d 909 (6th Cir.), *cert. denied* 415 U.S. 924, 94 S.Ct. 1428, 30 L.Ed.2d 480 (1973).

Accordingly, the judgment of conviction is affirmed.

Affirmed.