**UNITED STATES of America,**

v.

**Michael FALKOWITZ, a/k/a "Mike Jacobs", Steven Falkowitz, Steven Dreyfus, and Benjamino R. Baiocco, Defendants.**

**No. 01 CR. 852(VM).**

United States District Court, S.D. New York.

Aug. 7, 2002.

Michael G. Berger and Scott R. Matthews, Law Offices of Michael G. Berger, New York City, for defendant Michael Falkowitz.

Frederick L. Sosinsky, New York City, for defendant Steven Falkowitz.

Scott B. Tulman, New York City, for defendant Steven Dreyfus.

Wayne P. Stix, White Plains, NY, for defendant Benjamin R. Baiocco.

Daniel S. Ruzumna, Assistant United States Attorney, Mary Jo White, United States Attorney, Criminal Division, New York City, for United States.

## DECISION AND ORDER

MARRERO, District Judge.

Defendants Michael Falkowitz, a/k/a "Mike Jacobs" ("M.Falkowitz"), Steven

Falkowitz ("S.Falkowitz"), Steven Dryfus ("Dryfus") and Benjamino R. Baiocco ("Baiocco") (collectively "Defendants") are charged by superceding indictment S1 01 Cr. 852 (the "Indictment") with one count of conspiracy in violation of 18 U.S.C. § 371, six counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, and two counts of wire fraud in violation of 18 U.S.C. § 1343. Pending before the Court is Defendants' Joint Omnibus Motion (the "Motion") to: (i) dismiss the indictment in its entirety; (ii) suppress evidence pursuant to Federal Rule of Criminal Procedure ("F.R.C.P.") 12(b)(3); (iii) request an evidentiary hearing regarding pre-arrest statements made by Baiocco; and (iv) compel a bill of particulars and additional discovery pursuant to F.R.C.P. 12(b)(4). The Government opposes the Motion and also requests an evidentiary hearing concerning pre-arrest statements made by Baiocco. Among the questions the Motion raises is whether the conduct of which Defendants are accused constitutes an intentional scheme to defraud, as defined by the mail and wire fraud statutes, absent evidence that the alleged victims displayed ordinary prudence and comprehension under the circumstances—an issue on which various circuit courts are split and the Second Circuit has not pronounced itself definitively, despite some relevant dicta. For the reasons set forth below, the Motion is granted in part and denied in part.

## I. BACKGROUND

Fraud, in this way perhaps unique among offenses, may hold the distinction for inspiring the greatest creativity in the criminal mind. Every phase of fraud's consummation typically occasions the exercise of acute imagination. There is the sharpness that enables the initial recognition of frailty, the opportunistic flair that pinpoints both the victim and the opportunity to make a market of depriving the unwitting of their money or other property. When that opportune moment for exploitation arises, the trickster then evinces a canny knack to seize upon the target's particular weakness at its most fragile.

In aid of keen perception and timing comes fraud's inventive spirit. The schemer devises wiles and perfects ways and means equal to the victims' flaws, employing fraud's peculiar charms to gain their trust by plying them with promises and lulling them with falsehoods.

Deceit also demands the craft and guiles of the dramatic arts, not only to pass off the artifice as real, but to entertain while distracting, to sustain the act and at the same time avoid detection. By these means, the intriguers endeavor to convert deception into a gainful livelihood which they hope will pay off handsomely while leaving the victims taken in by the performance, often in multitudes, momentarily gratified and even thankful.

Rounding out this arsenal are the stores of creativity the imposters reserve for denial and defense. No less inventive than the prowess to contrive, beguile and dissemble are the ingenuities that frauds commonly summon to explain away why a sham is not a sham. A mark of this nimbleness is the many ways they design to fault the duped for being duped. Their foul play exposed, the wrongdoers in essence then accuse their victims of imprudently bringing harm upon themselves by not being alert or astute enough soon enough to recognize the fake in the person they fully trusted, and to take effective steps to avert their self-inflicted injuries.

The Motion, as emerges from the fraud charges the Government levels in this case, and from Defendants' counter-arguments, exemplifies many aspects of these elements and patterns.

## II. *FACTS*

The Indictment sets forth the Government's allegations against Defendants and is incorporated by reference here.[1] To briefly summarize the charges, Empire State Financial Group ("Empire") facilitated the transfer of ownership and entitlement to life insurance policy death benefits from the insured person (the "viator") to investors who provide immediate payment for those rights. Upon the viator's death, the life insurance policy proceeds would be distributed to the investor. This investment practice is known as viatical settlements, and the process of transferring such rights is referred to as "viaticating" a life insurance policy. Defendants were officers or agents of Empire. M. Falkowitz served as the Director of Empire and was in charge of all operations. S. Falkowitz was Empire's Operations Director, also a managerial position. Dreyfus was the New Business Development Director and was primarily responsible for the purchase of life insurance policies from viators and viatical brokers. Baiocco was an independent insurance agent who sold life insurance to individuals who subsequently viaticated their policies through Empire.

Investments in viatical settlements, though probably occupying a highly-specialized, narrow corner of financial markets, apparently comprises a legitimate industry, even when centered on insured people known to have lower life expectancies. According to the Government's accusations, into this lawful if untraditional investment business Defendants, applying their entrepreneurial creativity and inventive energies, carved a macabre market niche as their method of livelihood. Empire and its employees solicited investments in life insurance policies owned by individuals who either had AIDS or tested HIV positive. Ordinarily, if an applicant stated he was HIV positive, his application for life insurance was rejected. However, as the operating method of the fraudulent scheme the Government charges (the "Scheme"), Empire's employees recruited people they knew had been diagnosed with HIV to apply for life insurance under the misrepresentation of being HIV negative.

Defendants' purpose was enabled by a weakness in the insurers' business practices that Defendants spotted and exploited as a lynchpin of their Scheme. Various carriers, as a means of facilitating life insurance for some individuals at lower premiums, maintained a practice of not requiring applicants for policies with face values under $100,000 to undergo medical examinations, thereby reducing underwriting costs and presumably passing some of the savings to the consumers in the form of more affordable coverage. This business policy, if a laudable constructive boon for some, opened for others a method for spoliation, perhaps true to the reality that much of life carries within it the vulnerability for its corruption by unsuspected agents of corruption. The Indictment alleges that Defendants knowingly induced individuals who had AIDS or tested HIV positive to engage in fraud by falsely and intentionally misrepresenting that they were in good health in order to obtain insurance for which they otherwise would not qualify and then to sell their policies through Empire. Empire would arrange viaticatical settlements with regard such fraudulent insurance policies, paying the viators a fraction of the face value of the policies, marketing the policies to investors and retaining a portion of the viatical settlement payment in exchange for its services.[2] Defendants allegedly made various

---

1. *See* discussion *infra* at Part III.A.

2. Closing the loop on the cycle associated with charges of fraud, Defendants deny that

mailings and telephone calls in furtherance of the Scheme, including the mailing ·of insurance policies and viatical settlement agreements.

During the Government's investigation preceding the Indictment, it obtained a warrant to search Empire's premises. To show probable cause, the Government submitted the Amended Affidavit of Stephen R. Tortorella, dated May 9, 1999 ("Tortorella Aff."). According to the Tortorella Affidavit, Empire "specialized in viatical settlements". (*Id.*, at ¶ 4.) The Government had identified a confidential witness ("CW") who was recruited by Empire to participate, and who not only participated but also referred other persons to participate, in the Scheme. The CW, who is HIV positive, obtained a life insurance policy upon the representation that he was HIV negative. The CW then sold the policy to Empire. According to the CW, all employees of Empire were aware of or involved in the Scheme. The Federal Bureau of Investigation also had "identified approximately 84 participants (in addition to [Empire's] employees)" in the alleged fraud. (*Id.*, at ¶ 4.) The Government believed that Empire had "fewer than ten file cabinets holding business records relating to viatical settlements" on the premises, (*id.*, at ¶ 3), and sought to search and seize items that "constitute evidence, fruits and/or instrumentalities of violations of 18 U.S.C. § 1341 [mail fraud] and/or 18 U.S.C. § 1956 [money laundering]." (*Id.*, at ¶ 12.)

Magistrate Judge Peck issued a warrant authorizing a search of Empire's premises and seizure of:

Documents pertaining to viatical settlements, including,

A. Life insurance applications and policies

B. Trust agreements

C. Viatical settlement applications

D. Bank statements, deposit slips, canceled checks, withdrawal slips, check stubs, and other bank documents

E. Medical records and life expectancy evaluations for viators

F. Viatical settlement contracts between viatical settlement provider and investors

G. Mailing envelopes, labels, and other documents which record times and dates of sending or receiving United States Mail or other interstate delivery services

H. Viatical settlement contracts between viatical service provider and viators

I. Quotes or other offers of viatical settlement

J. Records of premium payments made to life insurance companies on behalf of viators

K. Correspondence with insurance companies, viators, investors, other viatical settlement providers, and viatical escrow services

L. Viatical settlement offers from viatical settlement companies

the Scheme constitutes an artifice intended to defraud. According to Defendants' creative theory, since the insurance companies required no medical examination, the investors were on notice that the viators' applications could have been fraudulent, because they were not double-checked. Defendants also contend that the insurance companies were not defrauded because they could have sought to have medical examinations performed. Regardless of these arguments, which are discussed *infra* at Part III.B., because medical examinations were not a requirement, the recruits' false representations were not likely to be detected.

M. Journals of cash receipts, disbursements, and sales

N. Handwritten notes, address books, faxes, and memos reflecting correspondence between viators and viatical settlement companies

O. Telephone bills and records

P. Records reflecting names, addresses and telephone numbers of current and former employees.

(Search Warrant, No. 99 Mag. 807, issued May 5, 1999, at Ex. A.) The search was executed on May 6, 1999.

In preparation for trial, the Government has produced "approximately 100,000 documents" to defendants. (Memorandum of Law in Support of Defendants' Joint Omnibus Motion ("Def.Mem."), at 22.) Defendants sent the Government several letters requesting a bill of particulars, which the Government declined. Defendants also requested additional discovery. It appears that the Government provided most of the requested additional discovery, except for the following: (a) a list of documents the Government intends to offer at trial; (b) early production of material to be introduced pursuant to Federal Rule of Evidence 404(b); (c) copies of audiotapes containing conversations of defendants or alleged co-conspirators; and (d) a list of witnesses the Government intends to call at trial.

## III. DISCUSSION

### A. STANDARD OF REVIEW

Rule 12(b) of the Federal Rules of Criminal Procedure requires that, prior to trial, a defendant raise any defenses or objections based on defects in the indictment and make motions to suppress evidence or request discovery. *See United States v. Crowley,* 236 F.3d 104, 108 (2d Cir.2000). The Motion raises these issues. Rule 12(b) further provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination without the trial of the general issue." Thus, on a motion to dismiss made under Rule 12(b), a court assesses the legal sufficiency of an indictment without consideration of the evidence the government may introduce at trial. *See United States v. Alfonso,* 143 F.3d 772, 776–77 (2d Cir.1998); *United States v. Gambino,* 809 F.Supp. 1061, 1079–80 (S.D.N.Y.1992) (citations omitted); *see also United States v. Mosley,* 500 F.Supp. 601 (N.D.N.Y.1980) ("The Court has such discretion where a question of law is involved but where, as here, the question is one of fact, i.e., the defendant's physical ability to stand trial, a dismissal is not proper."). A defendant's first proper opportunity to make motions testing the strength of the Government's proof is at the end of the Government's presentation. *See* Fed. R.Crim. Proc. 29; *see also United States v. Workman,* 397 F.Supp. 562, 563 (S.D.N.Y.1974).

By contrast, where a defendant seeks to suppress statements allegedly made in violation of his *Miranda* rights, a court should hold a hearing and make the necessary factual findings. *See United States v. Mathurin,* 148 F.3d 68, 69 (2d Cir.1998). Similarly, district courts have discretion to make factual findings necessary to resolve requests for discovery made under Rule 12(b)(4). *See* Fed.R.Crim.P. 12(b)(4), 16; *see also United States v. Covington,* 395 U.S. 57, 60, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969).

Finally, the issuance of a bill of particulars is governed by Federal Rule of Criminal Procedure 7(f). In exercising its discretion to grant a bill of particulars or not, a district court evaluates the charges contained in the indictment and the state of discovery. *See* discussion *infra* at Part III.C.1.

## B. DEFENDANTS' MOTION TO DISMISS THE INDICTMENT IN ITS ENTIRETY

The Court's consideration of a pre-trial motion to dismiss an indictment must begin with a review of Rule 7(c) of the Federal Rules of Criminal Procedure and the principles governing its application. In relevant part, Rule 7(c) provides that: "the indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Rule 7(c) appears to reflect the Constitutional requirement that an indictment allege the essential facts constituting the offense charged. *See* U.S. Const. Amend. V, VI; *see also United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 760–61, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). In this connection, the Supreme Court has stated that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Essentially, a sufficient indictment will track the language of the statute charged and identify the approximate time and place of the alleged crime. *See DeVonish v. Keane*, 19 F.3d 107, 108 (2d Cir.1994) (citations omitted).

The conspiracy statute under which Defendants are accused proscribes the punishment for each "two or more persons [who] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. The elements of the mail fraud charge contained in the Indictment are: (1) the existence of a scheme or artifice, (2) devised or intended to defraud or deprive another of money or property by means of false representations or pretenses, and that is (3) furthered by the use of the mail. *See* 18 U.S.C. §§ 1341; *United States v. Handakas*, 286 F.3d 92, 100 (2d Cir.2002); *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir.2000).[3]

---

**3.** The Second Circuit no longer holds that "[i]n every mail fraud case, there must be a scheme to defraud, representations known by defendants to be false and some person or persons must have been defrauded." *United States v. Baren*, 305 F.2d 527, 528 (2d Cir. 1962). Rather, the emphasis shifted from the victim's injury to the actions and intent of the defendant. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir.1970) ("Proof that someone was actually defrauded is unnecessary simply because the critical element in a 'scheme to defraud' is 'fraudulent intent.' ") (quoting *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896)); *but see United States v. Pierce*, 224 F.3d 158, 166 (2d Cir.2000) (reasoning that if there is no property right "with which the defendant might interfere, we do not think that the defendant's plan to make misleading statements to the [intended victim] would have constituted a scheme to defraud.").

Thus, the *Baren* case does not reflect the current state of the law.

In *Baren*, defendants were convicted of mail fraud for their work-at-home sales pitch of sewing and knitting machines as easy to use and promising easy and ready income, when in fact the machines were difficult to operate. 305 F.2d at 530–33. The issue on appeal was whether there was adequate evidence to support the conviction. *Id.* at 528. The defendants specifically challenged the government's proof that the misrepresentations were "material". In its discussion of the evidence presented at trial, the Second Circuit stated that "in a mail fraud case the court must be mindful of the fact that 'It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension ....' ". *Id.* at 533 (quoting *Silverman v. United States*, 213 F.2d 405, 407 (5th Cir.1954)). The *Baren* court's obser-

The elements are substantially the same for the crime of wire fraud. *See United States v. Covino*, 837 F.2d 65, 71 (2d Cir. 1988); *United States v. Rybicki*, 287 F.3d 257, 261 (2d Cir.2002). To show a scheme or artifice to defraud, the government must show that: (1) a scheme to defraud existed; (2) the defendant has specific intent to defraud; and (3) material misrepresentations. *See Handakas*, 286 F.3d at 100 (citations omitted). Accepting as true the Government's factual allegations, the Indictment in this matter tracks the express language of the statutes and unambiguously states the elements that constitute the offenses charged. *See De Vonish*, 19 F.3d at 108.

Defendants do not challenge the Indictment for failure to state the elements of the charges against them. Rather, Defendants contend that, as a matter of law, the Government's case lacks any fraudulent misrepresentation, that the mailings identified in the indictment were not made in furtherance of the alleged conspiracy or mail or wire fraud, and thus that the Government cannot prove beyond a reasonable doubt that Defendants are guilty of conspiracy or fraud. The Government counters that Defendants' challenge to the Indictment addresses not its facial validity but the sufficiency of the Government's proof to sustain the charges. The Court agrees. *See Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998).

Defendants, perhaps recognizing the flaw in their stance, reply that the Court would have no need to review the evidence underlying their motion to dismiss because the Court can take judicial notice of "(a) the many methods by which the insurance companies could have verified the statements made in the viators' applications,

and (b) the fact that, as to the investors, the application is an integral part of the insurance policy, thus providing the investors with the opportunity to compare the applications with medical summaries." (Reply Memorandum of Law in Support of Defendants' Joint Omnibus Motion, at 1.) These are factual matters that go to the heart of the issues for determination by a jury. They do not fall within the scope of public facts of which a court can properly take judicial notice. *See* Fed.R.Evid. 201(b); *see, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (court may take notice of business documents, the filing of which is required by law). For the Court to accept Defendants' invitation would represent an invasion of the province of the jury. *See* Fed.R.Evid. 201(g).

### 1. *Fraudulent Misrepresentation*

Even if the Court could properly examine the sufficiency of the evidence at this state of the proceeding, Defendants' challenge to the Indictment would fail nonetheless. Defendants' primary argument in support of their motion to dismiss rests on the proposition that, as a matter of law, Defendants did not defraud either the insurance companies or Empire's investors. This conclusion follows, they contend, because the misrepresentations the viators made on their life insurance applications concerning their health were apparent and related to matters that the insurance companies could easily confirm from readily available external sources and that, though having the affirmative obligation to investigate, the insurers chose not to examine.

Defendants also point out that under the terms and conditions of the agreements

---

vation does not bear on the issue of whether the misrepresentation was material, and as

such it constitutes dictum.

the viators executed, the insurance companies reserved the right to require applicants to undergo physical examination and obtained written authorizations enabling the insurers to investigate any false or misleading statements regarding an applicant's health. Pursuant to these authorizations, Defendants maintain, the insurance companies could obtain the names of each applicant's prior physicians, as well as contact them and obtain access to an applicant's medical records. Also available to them was information in their own databases as well as records of the Medical Information Bureau. According to Defendants, the insurers chose not to avail themselves of these resources. Had they investigated the misrepresentations made by the applicants, the insurance companies could have uncovered the alleged fraud. By means of their authorizations, the viators supplied the insurance with the means to uncover the alleged fraud and, in effect, disclosed the Scheme. And so, Defendants' dialectic concludes, under these circumstances they cannot be held responsible for mail or wire fraud.

In support of their theory, Defendants rely upon the Second Circuit's dicta in *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir.1999), regarding the sufficiency of evidence to establish a scheme to fraud. In *Brennan*, defendants were executives for an unincorporated entity organized to manage a consortium of insurance companies. The company, acting on behalf of parties potentially liable for injuries arising out of airline accidents, was responsible for assessing claims and preparing for litigation. In connection with the particular accident at issue, defendants served as agents for two parties whose interests in the underlying litigation did not coincide. The prosecution argued that defendants did not disclose the conflict of interest and thereby breached fiduciary duties; further, the defendants made affirmative mis-

representations by sending letters "that led the victims to accept, rather than question, [the company's] handling of the ... claims and litigation and its allocation of all responsibility to" only one party. *Id.* at 143. A jury convicted the *Brennan* defendants of mail fraud.

The Second Circuit vacated the judgment on the ground of improper venue. Nevertheless, that Court went on to state that it had "some question" regarding the sufficiency of evidence that the defendants had made affirmative misrepresentations to the alleged victims of the fraud. *Id.* at 150. The Court's question suggests that a scheme to defraud might not be proven if the alleged fraudulent representation " 'is about something which the [alleged victim] should, and could, easily confirm—if they wished to do so—from readily available external sources.' " *Id.* at 151 (quoting *United States v. Brown*, 79 F.3d 1550, 1559 (11th Cir.1996)).

The *Brown* case cited in *Brennan* sets forth a minority rule that in order to prove mail fraud the Government must show that a defendant intended to create a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Brown*, 79 F.3d at 1557. In *Brown*, executives of a company selling real estate investment properties located in Florida were convicted of mail fraud for misrepresenting the value of the investments. They appealed on the basis that their sales pitches constituted " 'puffing' or 'sellers' talk' ". The Eleventh Circuit agreed: "A 'scheme to defraud' under the pertinent criminal statutes has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm—if they wished to do so—from readily available external sources." *Id.* at 1559 (citing *Associates in Adolescent Psychiatry v. Home Life Ins.*

*Co.*, 941 F.2d 561, 570 (7th Cir.1991), *Blount Fin. Services, Inc. v. Walter E. Heller and Co.*, 819 F.2d 151, 153 (6th Cir.1987), *Caraluzzi v. Prudential Sec., Inc.*, 824 F.Supp. 1206, 1212–13 (N.D.Ill. 1993) and *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 425 (S.D.N.Y. 1992), as well as the contrasting precedents of *U.S. v. Parker*, 839 F.2d 1473, 1480–81 (11th Cir.1988) and *U.S. v. Goodman*, 984 F.2d 235, 240 (8th Cir.1993)).

Thus, the Brown Court relied on civil fraud case law in making its pronouncement. Further, as it acknowledged by citing to *Parker* and *Goodman*, the civil context involves different elements and reasoning from the criminal context. *See also Neder v. United States*, 527 U.S. 1, 17–23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that to constitute a scheme or artifice to defraud under § 1341, the misrepresentation at issue must be "material" as defined by the common law but reasoning also that not all common law fraud concepts are applicable to the federal criminal context).

Defendants rely on other circuits' case law for the proposition that to state a civil cause of action for mail fraud under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–64, a plaintiff must show that the misrepresentation or omission must have been " 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *Blount*, 819 F.2d at 153 (quoting *U.S. v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979)). In *Blount*, the defendants "charged too high a 'prime rate' and thereby concealed or refused to disclose" the prime rate of interest. *Id.* at 152. The Sixth Circuit determined that the prime rate was equally available to both parties and easily verified; as such,

the defendants' misstatement could not constitute fraud. *Id.* at 153. Likewise, Defendants point out that in the Seventh Circuit, Judge Easterbrook has stated that: "Fraud [in the civil context] occurs only when a person of ordinary prudence and comprehension would rely on the misrepresentation." *Associates in Adolescent Psychiatry*, 941 F.2d at 570 (finding no fraud where "the truth was under [victim's] nose in black and white (many times over).").

In support of importing the civil rule into the criminal context, Defendants rely on the case *United States v. Goodman*, 984 F.2d 235 (8th Cir.1993). In *Goodman*, a criminal conviction of mail fraud, based on a promotional mailing advertising a 900–number stating that recipients were "eligible" for gifts, was vacated because "criminal prosecution cannot be used to punish those who run promotional schemes to make money simply because some persons are more susceptible to try their luck than a more prudent recipient of the mail." *Id.* at 240. Thus, Defendants argue that the penal sanction should not be used to create additional protection for foolish investors.

District Courts of the Second Circuit, too, enunciate the justifiable reliance rule that "access [to material information] 'bars claims of reliance on misrepresentations' " in the civil RICO context. *See Compania Sud–Americana*, 785 F.Supp. at 419 (quoting *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737 n. 13 (2d Cir.1984)). However, it is not clear that the Second Circuit has imported this rule from the civil fraud context into the criminal fraud context. Indeed, the Second Circuit has not endorsed the *Brown* rule. *See U.S. v. Boyd*, 2 Fed. Appx. 86, 91, 2001 WL 40781 (2d Cir.2001).

Contrasting with Defendant's arguments, recent case law in other circuits reflects that the majority of appellate

courts addressing the issue decline to introduce the civil, justifiable reliance principle into the criminal fraud context. *See United States v. Davis*, 226 F.3d 346, 358–59 (5th Cir.2000); *United States v. Ciccone*, 219 F.3d at 1083 (9th Cir.2000); *United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir.1991); *United States v. Maxwell*, 920 F.2d 1028, 1036 (D.C.Cir.1990); *United States v. Brien*, 617 F.2d 299, 311 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

In *Brien*, defendants were convicted of mail and wire fraud for their "boiler room" tactics in soliciting investors using false and misleading information. 617 F.2d at 303–304. On appeal, defendants argued that the Court's instruction to the jury that the mail and wire fraud statutes protect "the naive as well as the worldly-wise" was inconsistent with a prior instruction and erroneous. The First Circuit rejected defendants' appeal because:

> If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts. The only issue is whether there is a plan, scheme or artifice intended to defraud.

*Id.* at 311. The First Circuit's reasoning has been adopted by the majority of Circuits to address the issue.

In adopting the reasoning of *Brien*, the District of Columbia Circuit repeated its rule that, concerning a prosecution for mail or wire fraud, "monumental credulity of the victim is no shield for the accused." *Maxwell*, 920 F.2d at 1036 (quoting *Deaver v. United States*, 155 F.2d 740, 744–45 (D.C.Cir.1946)). The Fifth Circuit approved of a jury instruction that "the naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal con-

duct" and rejected a defendants argument that "a misrepresentation is only material if a reasonable person would rely on it." *Davis*, 226 F.3d at 358. Similarly, the Ninth Circuit rejected an appeal based on its prior rule that the government had "to prove that the scheme to defraud was reasonably calculated to deceive persons of ordinary prudence and comprehension" to hold that "the wire-fraud statute protects the naive as well as the worldly-wise." *Ciccone*, 219 F.3d at 1083 (internal quotations and citations omitted).

Likewise, in *Biesiadecki*, the defendant solicited investors by convincing them to apply for loans and invest the proceeds in his venture. 933 F.2d at 542. The defendant argued that the mailing of loan application forms at issue " 'undermined' any fraudulent misrepresentations" in that the defendant instructed the victim to lie on the application forms in order to "get into the business." *Id.* Accordingly, it appears that the victim had some notice that the dealing was shady. The defendant appealed his conviction, arguing that he ought to have been allowed to introduce evidence that customers not named in the indictment were not misled by his representations. The Seventh Circuit denied the appeal, holding that the mail fraud statute did not require the intended victim actually to be defrauded and that: "Those who are gullible, as well as those who are skeptical, are entitled to the protection of the mail fraud statute." *Id.* at 544 (citation omitted). To focus on the intended victim's understanding "improperly" shifts attention "away from the knowledge and intent of [the defendant]." *Id.* (citation omitted).

However, reliance on precedents from other circuits with respect to the applicable fraud standard would be misguided because even within circuits there is apparent disarray. As one example, the

Ninth Circuit's ruling in *Ciccone* adopted the lower threshold that it is immaterial whether only the most gullible could have been deceived. 219 F.3d at 1083 (citing *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir.1999) and *Lemon v. United States*, 278 F.2d 369, 373 (9th Cir.1960)). At the same time, that court acknowledged, without specifically overruling, earlier precedents that endorse the standard requiring that a scheme to defraud be reasonably calculated to deceive persons of ordinary prudence and comprehension. *See id.* (citing *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.1980), *United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir.1990) and *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984)). A similar ambiguity as to the applicable test is manifest in still extant precedents in other circuits. *Compare United States v. Brandon*, 17 F.3d 409, 425 (1st Cir.1994), with *Brien*, 617 F.2d at 311; *Davis*, 226 F.3d at 358–59, with *United States v. Netterville*, 553 F.2d 903, 908 (5th Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979) with *Bogy v. United States*, 96 F.2d 734, 741 (6th Cir.), *cert. denied*, 305 U.S. 608, 59 S.Ct. 68, 83 L.Ed. 387 (1938); *Spiegel v. Cont'l Ill. Nat'l Bank*, 790 F.2d 638, 646 (7th Cir.1986), with *United States v. Coffman*, 94 F.3d 330, 333–34 (7th Cir.

1996)[4]; *Rudd v. United States*, 173 F. 912, 913–914 (8th Cir.1909), with *Goodman*, 984 F.2d at 235.

The Second Circuit has not indicated which rule it would follow. Recently, the Circuit Court assumed "*arguendo* that objective reasonableness is an element of federal fraud claims" only to affirm convictions of conspiracy to commit mail fraud and the substantive offense of mail fraud based on its finding of sufficient evidence of objective reasonableness on the record. *Boyd*, 2 Fed. Appx. at 90, 2001 WL 40781 (emphasis in original). In doing so, the *Boyd* Court noted the split discussed above between the Fifth, Seventh, Ninth and D.C. Circuits on the one hand and the Eleventh Circuit on the other. *See id.* (citations omitted). Accordingly, this Court is not bound by either set of precedents and may select and apply the rule it deems appropriate as most consistent with other relevant principles recognized in this Circuit.

■ This Court finds the majority's broader interpretation and analysis more persuasive. A rule that encompasses the greater protection from fraud better comports with the plain language of the statutes and is more consistent with policy concerns in the enforcement of criminal law. The precise working of the legislation requires the Government to prove (1)

---

4. The *Coffman* court, noting the apparent internal and inter-circuit conflicts in the standards articulated by various Courts of Appeals, expressed doubt that there is real inconsistency in these rulings. Endeavoring to reconcile the discrepancies, the court postulated that the "reasonable person" language cited by some courts was employed not as a reference to the intended victims of fraud but "to guide the jury in evaluating circumstantial evidence of fraudulent intent: that the defendants' scheme was calculated to deceive a person of ordinary prudence is some evidence that it was intended to de-

ceive" and to "gesture[ ], although clumsily, toward the indistinct border zone between real fraud and sharp dealing." *Id.* This explanation, however, does not satisfactorily account for the evidentiary requirement imposed by a ruling such as *Brown*, where the court elevated the "reasonable person" test to a distinct element of the offense that the government must establish with sufficient proof. *See Brown*, 79 F.3d at 1558 ("Federal criminal fraud requires proof that a person of ordinary prudence would rely on a representation or deception").

the existence of a scheme or artifice (2) devised or intended to defraud or deprive another of money or property and (3) that is furthered by the use of the mail or interstate wires. *See* 18 U.S.C. § 1341; *Handakas*, 286 F.3d at 100; *United States v. Pierce*, 224 F.3d at 165. Nothing in the text of the statutes makes any reference to any subjective test or personal characteristic of the victim. Absent explicit reference in the penal statute itself, an additional requirement articulating the reasonable person standard would have to be judicially imported from civil fraud principles.

The more stringent "reasonable person" rule necessarily assumes that Congress intended to recognize varying tiers of fraudulent schemes, distinguishing in accordance with the level of the victim's sophistication and criminalizing only those specifically designed to deceive the more resourceful and better endowed targets. Neither the statutory silence on this issue or the sparse legislative history evinces such a Congressional purpose. *See, e.g., Brien*, 617 F.2d at 311 ("We discern no intention on the part of Congress to differentiate between schemes that will ensnare the ordinary prudent investor and those that attract only those with lesser mental acuity."). As regards the criminal conduct, the specific elements of every crime must be explicitly particularized in the statute defining the offense, and cannot be left implication or judicial engraftment. *See Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.") (citing *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812)); *see also Handakas*, 286 F.3d at 101 (citing *Fasulo v. United States*, 272 U.S. 620, 629, 47 S.Ct. 200, 71 L.Ed. 443 (1926)).

To the contrary, §§ 1341 and 1343 explicitly hinge on the existence of a scheme intended to defraud, using mail or wire means to further that deceptive purpose. *See generally United States v. Young*, 232 U.S. 155, 161, 34 S.Ct. 303, 58 L.Ed. 548 (1914); *McNally v. United States*, 483 U.S. 350, 356–60, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), *superceded by statute*, 18 U.S.C. § 1346; Jed S. Rakoff, *The Federal Mail Fraud Statute*, 18 Duq. L.Rev. 771 (1980). The centrality of the relationship between the scheme and its unlawful purpose, as evidenced in the plain language of the statute, suggests that the nature of the victim is immaterial and that the proper inquiry concerning violation of the law should be on these criteria rather than on the nature of the victim. Under this approach, it is primarily the familiar badges and patterns of a scheme to defraud, as recorded by longstanding and recurring experience, that should matter in establishing a violation of either §§ 1341 or 1343. In addition to the jurisdictional element, these include: some degree of defendants' premeditation and planning; a structure or method, either preexisting or corrupted for its end, designed to carry out the unlawful enterprise; designated targets of the venture; the victim's money or other valuable of which the perpetrator seeks to deprive the target by means of the plan; deception employing deliberate affirmative misrepresentations or material omissions as tools to advance the scheme and conceal its purpose, as well as to mislead concerning the true colors of the offender; motive, or the scheme's whole *raison d'etre*, to take advantage of the victim's ignorance and vulnerability and induce him to part with his property, the fraud thereby expecting to achieve some private gain. *See generally Brien*, 617 F.2d at 302–04; *Biesiadecki*, 933 F.2d at 541–42; *Ciccone*, 219 F.3d at

1080–81; *Davis*, 226 F.3d at 348–49; *Maxwell*, 920 F.2d at 236–37.

Captured in general terms, the essence of the fraudulent scheme these hallmarks share reduces to the social evil the artifice defines: that it departs from moral norms; that it transgresses the rules of honest dealing and fair play and breaches the bonds of trust upon which human affairs ordinarily are grounded, and instead corrupts personal and business intercourse with pervasive deceit that falsely exploits and thus undermines these basic values. *See Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958) (describing fraud as a deviation from conduct that is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life members of society.").

So focused on the wrongdoer's scheme and intent, these factors necessarily omit any reference or consideration of the nature of the victim. Artifice designed to deceive would be no less fraudulent whether in devising it the swindler had in mind mulcting the sophisticate or the naive; the frail or careless as well as the most discerning. *See Biesiadecki*, 933 F.2d at 544.

By contrast, the more stringent "prudence and comprehension" standard shifts the statutory inquiry from the deceiver to the deceived; from the fraud's intent to the gullibility and reasonableness of the victim; and from the nature of the artifice to the inartfulness or state of mind of the target the con artist actually tricks by it. In other words, this standard asks not whether the offender was a fraud but whether his victim was a fool; it seeks less to capture the predator than to fault his prey.

The "reasonable person" inquiry, of course, goes to the essence of the justifiable reliance element of civil fraud. But, whatever its applicability as an aspect of a tort, it is inapposite in the criminal context of §§ 1341 and 1343. *See Neder*, 527 U.S. at 22–23, 119 S.Ct. 1827 (reasoning that "[t]he common law requirements of 'justifiable reliance and damages', for example, plainly have no place in the federal fraud statutes.") (citations omitted); *Brien*, 617 F.2d at 311 (in rejecting defendants' argument that the ordinary prudence and comprehension test applied, the court noted that "[t]hese are criminal statutes, not tort concept."). As a civil wrong, common law fraud rests on harm committed within private relationships. "Reasonable reliance" forms one of the bonds upon which private ties may be grounded and that is breached by the deceit. The mail and wire fraud statutes, recognizing that the underlying conduct they proscribe implicates social consequences far more serious than those generally surrounding individual disputes, criminalize not just actual injuries done to particular persons, but a "scheme or artifice" intended to defraud that offends public values as well. In this larger context, the civil law concept of justifiable reliance loses its meaning and purpose.

Because the federal fraud statutes proscribe and punish the fraudulent scheme rather than mere private damage associated with it, they do not require that the intended victim actually have been successfully defrauded, nor that any private injury or damage be proved. *See* discussion *supra* at Note 3; *see also Coffman*, 94 F.3d at 333 ("The statute punishment the scheme ... rather than the completed fraud .... It punishes, in short, the attempt to defraud.") (internal citations omitted); *Biesiadecki*, 933 F.2d at 544 (citing *Ward v. United States*, 845 F.2d 1459, 1462 (7th Cir.1988)); *Brown*, 79 F.3d at 1557 n. 12 (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991)). In this vein, and underscoring the recognized severity of the conduct, conspiracy to de-

fraud, which would not require commission of the underlying substantive offense, would suffice to constitute a separate crime. *See* 18 U.S.C. § 371. Whatever harms the criminal statutes thus encompass comprise public wrongs sanctioned for the protection of society as a whole. *See* 18 U.S.C. § 3553(a)(2); *see also People v. Farrar*, 52 N.Y.2d 302, 437 N.Y.S.2d 961, 419 N.E.2d 864, 865–66 (1981).

The reasonable person standard implicitly embodies a doctrinal illogic that contravenes the principle that proof of actual injury to the fraud victim is not required to establish the crime. At least in theory, raising the bar so as to demand evidence that an objectively reasonable person would have acted on defendants' representations and thus would have been deceived by a particular scheme, *see Brown*, 79 F.3d at 1557, may render it more difficult to prosecute and convict the perpetrators of fraud. This prospect may prevail especially with regard to schemes in which either no victims have been defrauded, or, as of the date of prosecution, there has been insufficient time or opportunity for the deception to snare the first intended mark. In these circumstances, defendants undoubtedly would construe the absence of actual victims as evidence that no person of ordinary prudence and comprehension could have been fooled by their conduct. Predictably, they would seize upon that void to argue that no scheme to defraud could be proven. *See, e.g., United States v. Pollack*, 534 F.2d 964, 971 (D.C.Cir.), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976) (noting that a holding that actual loss to the victim would be required "would lead to the illogical result that the legality of defendant's conduct would depend on his fortuitous choice of a gullible victim.")

By the same token, to allow a defendant to escape prosecution by holding that, as a matter of law, there is no specific intent to defraud in a case in which the only actual or potential victims duped by a particular device happen to be artless or imprudent persons may place a premium on victimizing the most vulnerable. *See Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1347 (7th Cir.1995) ("Taking advantage of the vulnerable is a leitmotif of fraud."); *Coffman*, 94 F.3d at 334 (noting that, with reference to the "person of ordinary prudence" standard, "it is hard to believe that this language is intended to be understood literally, for if it were it would invite con men to prey on people of below-average judgment or intelligence, who are anyway the biggest targets of such criminals and hence the people most needful of the law's protection and most needful or not are within its protective scope.").

Shifting the emphasis of the relevant probe to whether the victim acted reasonably, and whether objectively a person of ordinary prudence and comprehension would have been deceived by a given scheme, necessarily invites a distracting evidentiary debate entailing inquiry into which of the targeted victims acted reasonably and which did not, and into the reasons why or why not. In that context, the accused would seek to introduce witnesses to testify that they were not deceived by the alleged fraudulent scheme, or that in fact they derived some promised benefit from it, as evidence that the alleged victims did not act with ordinary prudence and comprehension, or that defendants could not have intended to deceive. *See Biesiadecki*, 933 F.2d at 543–44 ("The excluded testimony of the other ... customers [who were offered to testify they were not misled by defendant's representations] would have improperly shifted the jury's attention away from the knowledge and intent of Biesiadecki and focused instead on the beliefs of the victims of the alleged scheme to defraud."); *see also Ciccone*,

219 F.3d at 1082–83; *United States v. Elliott,* 62 F.3d 1304, 1308 (11th Cir.1996).

But, though the "reasonable person" standard is held to be an objective test, circumstances may not always permit readily ascertaining what is the proper measure of ordinary care in a given case, especially where defendants target a large and diverse group of persons as victims. The reasons why some people are fooled by a particular ruse and others are not may vary depending on individual characteristics and on differing attractions—whether financial, social or merely personal—comprising the appeal of the scheme. Some individuals may rely heavily on fraudulent representations because of the deceivers' stature and reputation; some may be misled because of the existence of a special relationship they had no inkling the offender would breach; some may accept a word-of-mouth recommendation of another person they trust, who in turn may have relied on prior dealings with or confidence in the wrongdoers; some simply may lack time, resources, inclination or special understanding to conduct investigations of the accuracy of the fraud's representations. Given this range of variables, situations may arise in which a highly sophisticated person may be taken in by a scheme that may not necessarily deceive one less discerning who just may happen to be better informed. Under these conditions, a multitude of victim responses may be conceivable, any one or more of which might reflect what plausibly may be considered the objectively reasonable conduct. As the cases cited above demonstrate, under the reasonable person standard, the array of the possibilities introduces into the trial another matter for factual debate, potentially complicating the proceeding and distracting the jury.

The "reasonable person" standard also places an unfair burden on the unsuspecting victim to guard against the conduct of persons intent on engaging in duplicitous practices. Such a rule effectively charges the target of deception with the obligation to take affirmative steps to prevent or discover the fraudulent scheme, contrary to the principle that the victim's failure to exercise ordinary care does not excuse a criminal act. *See United States v. Coyle,* 63 F.3d 1239, 1244 (3d Cir.1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *Davis,* 226 F.3d at 358–59.

Finally, the reasonable person standard could produce the unintended consequence of encouraging rather than deterring fraud. Such a rule may motivate and embolden the offenders to perfect their methods and sharpen their tactics. Striving towards higher level of deceit and sophistication, they would be comforted by the knowledge that their stratagems would cross the line into illegality only when people possessing the greatest acumen and worldly judgment would be fooled. Consequently, while charlatans who try harder to push the envelope into ever more polished designs to defraud may escape punishment if their handiwork would beguile only the select, the real victims of such refined chicanery may be left unprotected, and the fraud statutes would be relegated primarily to punishing wrongdoers who remain within true and tested means, targeting only what the more common fraud preys upon as workaday dupes.

█ In the light of the foregoing analysis, a closer look at the facts presented in *Brennan* easily distinguishes the fraud alleged there from the scheme the Government charges in the matter at hand, and suggests why the reasonable person standard would be inappropriate in either case, notwithstanding the Second Circuit's dictum. The unique circumstances that

emerged at trial may have raised doubts in the Circuit Court panel concerning the sufficiency of the evidence to establish the existence of a fraudulent scheme and defendants' specific intent to deceive. The events arose from a complex commercial relationship among corporations in a consortium in which defendants potentially owed conflicting agency or fiduciary obligations to several principals at the same time. The alleged unlawful conduct stemmed from defendants' handling of one transaction involving insurance claims relating to the crash of a commercial airliner.

In this context, valid questions could be raised as to whether the evidence could support a finding beyond a reasonable doubt that the conduct for which defendants were convicted manifested elements of a "scheme to defraud". Unlike the more prototypical case, defendants were engaged in a legitimate business of managing aviation insurance coverage and coordinating the settlement of accident claims. Nothing in the facts suggested that defendants' business was organized with a specific design to commit fraud by taking advantage of their unique business relationships or that the conflict of duties created by the intricate business connections was specifically planned and calculated to defraud the insurers they served. All the participating corporations in the insurance venture were aware of the different relationships among defendants and the consortium and, as a consequential aspect of their agreements, presumably accepted those potentially varying duties and loyalties. The outcome that one entity within the consortium may have benefitted at the expense of others by reason of defendants' conflicts was perhaps an unforeseeable byproduct of the arrangement, as opposed to a result calculated by defendants as an object of a scheme designed with fraud upon the consortium members as an end. In other words, rather than indisputably

manifesting a pre-planned device, the conflict appeared as a situation defendants backed into as events unfolded in connection with the one particular transaction at issue. Consequently, one reading of the evidence, perhaps the one that troubled the Second Circuit, may suggest that defendants' conduct did not evince an enterprise conducting an ongoing scheme that contemplated a fraudulent purpose in the charged transactions.

In this context, the issue concerning the applicable standard alluded to by the Second Circuit related less to the objective prudence and comprehension of the alleged victims than to the nature of the asserted fraud and the sufficiency of defendants' specific intent. The doubts the Circuit Court expressed would have been as pertinent regardless of the degree of the alleged victims' sophistication.

Turning to the facts the Government alleges in the instant case, the charges sufficiently detail the elements of Defendants' scheme to defraud the insurance companies by procuring the viators to file applications that misrepresented the state of their health and by arranging viatical settlements for investors, knowing that the underlying insurance contracts were obtained by fraud. Whether or not the insurers were imprudent in not demanding medical examinations of their customers, or comprehended that the applications may have contained false information, is immaterial to the existence of Defendants' artifice or to their fraudulent purpose.

Moreover, more extensive analysis of the facts the Government asserts further persuades the Court as to why the reasonable person standard Defendants urge must be rejected, and why that test would be inapposite here even if, for the sake of argument, it were held applicable. The Court finds no factual support for Defen-

dants' proposition that the Scheme was disclosed to the insurance companies or the investors or was easily discoverable from readily available external sources.

To fully assess Defendants' arguments, the Court would be forced to open the record so as to consider facts contained outside the Indictment's allegations and that are introduced by Defendants. As such, that the insurers were provided the names of the applicants' prior physicians and authorizations for access to their medical records does not of itself equate to disclosure of the nature of the fraud to which the insurers and the investors were subjected. This argument assumes the favorable results of any inquiry that may have been undertaken. Possessing the right to contact those doctors and obtain the information requires an affirmative act on the part of the victims to verify the accuracy or completeness of the information provided to them. · Whether or not the correct information actually is ascertainable does not necessarily rest on facts that can be immediately corroborated from a readily available source within the victim's control. Rather, it depends upon the actions of third persons, on the extent of willing cooperation and on availability of the external sources. In this case, it is conceivable that the applicants' reported prior physicians may or may not be real; or would choose not to respond to the insurer's inquiries; or, with or without collusion with the viators, supply further inaccurate or incomplete information to the insurers. In any of these prospects, the insurers would not have available an entirely independent source of information whose corroboration is subject solely to their own judgment and control. Nonetheless, under an application of the reasonable person standard to these facts, as Defendants urge, the insurance companies conceivably could be held to have acted imprudently by not adequately protecting themselves from fraud by not demanding a medical examination of every applicant. Thus, all of the alleged deceptive misconduct manifest in the elaborate Scheme the Government charges would be negated by the victims' supposed carelessness.

In addition, there is no evidence that the applicants' authorizations by themselves furnished notice of their fraud. For the insurers to become apprised of it would have required an additional step of verification through means and sources that are far from readily available. In some instances, had the insurers chosen to verify, it may have required not just obtaining records but conducting a review of them by medical professionals, or performing their own physical examinations of the applicants, and then obtaining those results and comparing them with the information the applicants provided. This process can hardly be said to rely on "readily available sources." *Brown*, 79 F.3d at 1559.

Moreover, that the viators supplied the names of physicians and access to medical records cannot of itself be deemed sufficient to impute to the insurers and investors knowledge of the viators' misrepresentations because, by providing the authorizations, the applicants were doing nothing more than complying with standard contractual requirements of the terms and conditions of their insurance applications. Needless to say, had they omitted or declined to abide by this prerequisite, it would have given rise to immediate grounds for suspicion and cause for the insurance companies to refuse to issue them policies. But that the applicants chose to adhere to what they were required to do cannot, without more, be held against the insurers.

Finally, Defendants' contention that there was no scheme to defraud because the applicants' misrepresentations could

have been verified independently from readily available information ignores a vital point. Medical records are in no way akin to any source of easily accessible public information, such as the investment information obtainable from newspapers that was at issue in *Brown, Associates in Adolescent Psychiatry, Blount Financial Services* or the other cases cited by Defendants. Quite the contrary, the information contained in medical records is by its very nature intimately confidential and protected as such by law. *See, e.g.,* 5 U.S.C. § 552a (The Privacy Act of 1974); 42 U.S.C. § 12101 *et seq.* (Americans with Disability Act); New York Civil Practice Law and Rules § 4504 (Patient–Physician Privilege Act); N.Y. Ment. Hyg. § 33.13; Conn. Gen. Statutes § 38a–815 *et seq.* (Connecticut Unfair Insurance Practices Act).

Similarly meritless is Defendants' argument that there was no scheme to defraud because the insurance companies acted unreasonably by failing to investigate the applicants' misrepresentations. To be sure, the insurers and investors here knowingly made a business decision, probably for a combination of financial and public policy reasons, to forego a physical examination or other medical tests in connection with insurance policies with a face value below $100,000. Such practice may have made insurance more affordable and accessible to people of modest incomes by lowering the costs of additional underwriting. In doing so, the insurers and investors relied upon the applicants' representations concerning their health, in particular their denials of any prior diagnosis for AIDS or HIV, that were sworn to under penalty of law.

This choice must have entailed the assumption of some business risk that some applicants, acting on their own, would provide false information in order to defraud.

That degree of commercial risk may be roughly estimated and deemed acceptable by reasonable business people. In fact, much fraud is grounded on precisely the double gamble asserted here. The key element is that an organization, on the basis of some financial or policy reason, decides to accept at face value the accuracy of representations made by clients. By the same token, some applicants, aware that not every representation will be pre-audited, take advantage of the business practice and assume the risk of being caught. Accordingly, an integral aspect of the individual fraud is to present facts that may be palpably false simply because the wrongdoer calculates that the probabilities for discovery are relatively low and devises his scheme so as to account for these odds.

But that is not to say that the insurance companies and investors contemplated the larger gamble Defendants here in essence ascribe to them: that sophisticated insurance professionals would detect in the insurers' business decision and associated risks an opportunity to build a cottage industry of organized fraud that exploits for Defendants' own gain the very aspect of the carriers' practice that made their business choice risky, and thus unwittingly expanding that financial exposure by incalculable degrees.

In this departure lies the critical difference, one of marked degree akin to the contrast between the blood sting of a mosquito and the practiced theatrical bite of a Dracula. Accepting the Governments's allegations as true for the purposes of the instant motion, the viators were not independent actors who separately and of their own accord discovered the weakness and gamble in the carriers' business choice and independently decided to engage in insurance fraud. Rather, they were recruited and induced to commit organized fraud by a scheme devised by Defendants. It was

Defendants who were aware of the insurance companies' practice of not demanding physical examinations for policies under $100,000 and contrived their own subset of the market to exploit that policy by causing the viators to submit insurance applications Defendants knew, at the time the applicants were filed, contained false information the insurance companies would act upon, as expected to the insurers' detriment and Defendants' profit.

Defendants' position, were it to prevail, would place the insurance companies in the no-win situation of choosing between foregoing a business opportunity that, even if risky, may have some broader commercial, social or public value or effectively encouraging persons like Defendants to build into the insurers' business plans a free license to subject themselves to fraud. Defendants also maintain that the insurance companies decision not to verify the truth or falsity of the viators' statements regarding their health status establishes that such representations were immaterial, and that the investors did not care that the applicants had lied to their insurers, thereby eliminating a necessary element of a scheme to defraud.

These arguments are unpersuasive. First, they again rest upon matters of fact that are not on the record at this stage of the proceeding. Whether or not the applicants' misrepresentations were material to the insurance companies or whether the investors cared that the viators lied in their applications cannot be accepted as fact merely on Defendants' conclusory assertion. Second, questions of materiality implicate mixed issues of law and fact that ordinarily should not be decided on a motion to dismiss. *See Alfonso,* 143 F.3d at 776–77.

Briefly, in this Court's view, as a matter of law the Indictment adequately sets forth the charges against Defendants and does not violate Rule 7(c) or the Constitution. Whether the Government proves its case will be better tested at trial. Defendant's motion to dismiss the Indictment on this ground is denied.

### 2. *In Furtherance of a Scheme to Defraud*

Defendants also argue that, as a matter of law, the mailings were not "in furtherance" of the alleged scheme to defraud. Defendants assert that the mailings identified in the Indictment provided the alleged victims with the means to uncover instances of fraud because they either provided or offered to provide the investor with a copy of the insurance contract. Thus, Defendant's theory concludes, the mailings reveal fraud and cannot be in furtherance of the Scheme.

A mailing is in furtherance of a scheme to defraud if "the scheme's completion or the prevention of its detection ... depended in some way on the charged mailing." *United States v. Castile,* 795 F.2d 1273, 1278 (6th Cir.1986) (reversing conviction where purpose of charged mailings was to detect fraudulent scheme). In the insurance context:

> mailings sent in connection with an ordinary insurance claims process are related to an insurance fraud scheme. Conversely, a mailing that places the defrauded insurer on notice of the fraud, impedes the execution of the fraud, or discloses the nature of the fraud, may not be said to be in furtherance of a fraudulent scheme.

*U.S. v. Tocco,* 135 F.3d 116, 125 (2d Cir. 1998) (citations omitted). In *Tocco,* mailings made in connection with the processing, investigation and facilitation of an insurance claim, as opposed to for the purpose of defeating a claim, were "in furtherance" of the fraudulent claim. *See*

*id.; see also United States v. Koen,* 982 F.2d 1101, 1107 (7th Cir.1992). In addition, a defendant's letter withdrawing a fraudulent claim was made in furtherance of the fraud because it constituted an attempt at concealing or limiting criminal liability. *See Tocco,* 135 F.3d at 126.

■ As previously discussed, the mailings in the instant case do not increase the likelihood that the fraud would be discovered. Rather, the communications at issue were directly related to the alleged scheme as it would unfold. The Indictment charges that Defendants would provide information to third parties interested in investing in viatical settlements. According to Defendants the insurance agreements mailed to the investors by Defendants disclosed that medical examinations were not conducted on the insured, but this information does not indicate that the viators made misrepresentations.[5] Nothing on the face of the policy, as detailed above, would alert the investor to the large-scale fraudulent operation charged in the Indictment. Thus, it appears that the communications furthered the process by which Defendants would profit from the sales of insurance they knew to have been procured through fraud. Indeed, the mailings were integral to the Scheme. Therefore, the Court denies Defendants' motion to dismiss on this ground.

## C. DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

### 1. The Fruits of the May 6, 1999 Search of Empire State Financial Group

Defendants challenge the warrant authorizing the May 6, 1999 search of Empire State Financial Group as overbroad. According to Defendants, the Tortorella Affi-

davit did not provide sufficient probable cause to grant police the authority to seize every document at Empire State Financial Group. As such, Defendants contend, the warrant's breadth exceeded the probable cause. Defendants do not argue that the Government disregarded the warrant by seizing documents outside its scope.

■ The use of general warrants facilitating wide ranging, exploratory searches or seizures is prohibited by the Fourth Amendment. *See* U.S. Const. Amend. IV; *United States v. George,* 975 F.2d 72, 75 (2d Cir.1992). Rather, a warrant must "particularly describe the things to be seized" and be supported by probable cause. *See Stanford v. State of Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *United States v. Young,* 745 F.2d 733 (2d Cir.1984).

■ Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A court reviews a warrant with deference to the issuing magistrate judge's determination of probable cause and a preference towards its validity. *See United States v. Smith,* 9 F.3d 1007, 1012 (2d Cir.1993) (rejecting *de novo* standard of review) (citations omitted); *see also Gates,* 462 U.S. at 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (a court should uphold a warrant so long as the magistrate had "substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing.").

■ To satisfy the particularity requirement, the language must be "suffi-

---

5. Again, in resolving the motion to dismiss, the Court does not consider Defendant's factual allegations that are outside the Indict-

ment. *See* discussion *supra* at Part III.A. The Court merely provides this information to explain Defendant's position.

ciently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir.2000) (internal quotation omitted). Even generic terms may be used to describe the material to be seized, as long as the warrant identifies a specific illegal activity to which the item related. *See United States v. George*, 975 F.2d 72, 76 (2d Cir.1992); *see also United States v. Dzialak*, 441 F.2d 212, 217 (2d Cir.1971).

■■■ If a warrant runs afoul of the particularity requirement, a court should suppress evidence obtained from use of that offending warrant. *See Stanford v. Texas*, 379 U.S. 476, 486, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *United States v. Buck*, 813 F.2d 588, 591–92 (2d Cir.1987). A warrant cannot give "the search party unfettered discretion to seize anything they see." *United States v. Mankani*, 738 F.2d 538, 546 (citing *Stanford*, 379 U.S. at 476, 85 S.Ct. 506 and *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). At the same time, if probable cause indicates that "criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements [of the Fourth Amendment]." *United States v. C.E.C. Services*, 869 F.2d 184, 187 (2d Cir.1989) (citing *National City Trading Corp. v. United States*, 635 F.2d 1020, 1024–25, 1026–27 (2d Cir.1980)); *United States v. Paccione*, 738 F.Supp. 691, 709 (S.D.N.Y.1990). A "mere allegation of fraud is not enough to authorize the seizure of all business records"; but where the "closely-connected nature" of a business renders it impossible "through a more particular description to segregate those business records that would be evidence of fraud from those that would not" a wide authorization is permissible. *United*

*States v. Johnson*, 886 F.Supp. 1057, 1072 (S.D.N.Y.1995) (internal citations and quotations omitted); *see also United States v. Dinero Express, Inc.*, No. 99 Cr. 975, 2000 WL 254012, *10 (S.D.N.Y. Mar.6, 2000).

■■■ Here, the Tortorella Affidavit indicated that every employee of Empire was either aware of or involved in the Fraud. Furthermore, the Government had identified 84 other participants in the Scheme, which thus allegedly involved a complex and diffuse cast of characters. Thus, although at first glance the warrant may appear to be overbroad, the Tortorella Affidavit provides adequate cause to support a reasonable belief that criminal activity pervaded Empire's viatical settlement business. As such, in authorizing the search and seizure of documents related to Empire's viatical settlement business, the warrant did not authorize an unconstitutionally wide search. Accordingly, the Court denies Defendants' motion on this ground.

### 2. The Pre–Arrest Statements Made by Biaocco

Defendants move that Biaocco's May 2, 2001 statement to federal agents be suppressed because they were made in response to interrogation after he "explicitly and unequivocally asserted his right to counsel in response to a custodial interrogation." (Def. Mem., at 20.) In support of the motion, Defendants filed the Benjamino R. Baiocco Affidavit in Support of Motion to Suppress, dated 12 March 2002 ("Baiocco Aff."). The Government denies the factual allegations of the Baiocco Affidavit; both parties request an evidentiary hearing. An evidentiary hearing is justified. *See United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir.1998). Accordingly, the Court grants the parties' request.

## D. *DEFENDANTS' MOTION TO COMPEL DISCOVERY*

### 1. *Request for a Bill of Particulars*

By letter dated January 8, 2002, Defendants requested that the Government provide them with a bill of particulars pursuant to F.R.C.P. 7(f). The Government declined. After the parties met and conferred in good faith to resolve their discovery dispute, Defendants applied to the Court for a bill of particulars requesting that the Government:

A. Identify the "others known" to the Government with whom the defendants allegedly conspired, as alleged in paragraph 9 [of the Indictment];

B. Identify the "others known" to the Government who, for the purpose of executing the alleged scheme to defraud, caused "things to be placed in a Post Office and delivered by the Postal Service, as alleged in paragraph 10 [of the Indictment]";

C. Identify the "others known" who, for the purpose of executing the alleged scheme to defraud, transmitted by means of wire communication in interstate commerce "writings, signs, signals, pictures and sounds," as alleged in paragraph 11 [of the Indictment];

D. Identify the "others not named as defendants herein" who agreed with defendants to engage in the conduct alleged in paragraph 12(a) [of the Indictment];

E. Identify "individuals with AIDS and who were HIV positive" who defendants allegedly caused to obtain life insurance policies through fraud, as alleged in paragraph 12(a) [of the Indictment];

F. Identify the "viatical settlements" referred to in paragraph 12(a) [of the Indictment] about which the Government intends to offer proof at trial;

G. Identify the "individuals with AIDS or who were HIV positive" who the defendants allegedly "arranged" fraudulently to obtain life insurance policies, as alleged in paragraph 12(b) [of the Indictment];

H. Identify the "individuals with AIDS or who were HIV positive" who the defendants allegedly recruited fraudulently to obtain life insurance policies, as alleged in paragraph 12(b) [of the Indictment];

I. Identify the "individuals with AIDS or who were HIV positive" whose fraudulently obtained life insurance policies the defendants allegedly "arranged" to viaticate, as alleged in paragraph 12(c) [of the Indictment];

J. Identify each investor referred to in paragraph 12(d) [of the Indictment] about whom the Government intends to offer proof at trial;

K. Describe the conduct engaged in by the "unknown" others with whom the defendants allegedly conspired to the extent the Government intends to refer to the conduct of these "unknown" others at trial;

L. Identify every entity, corporation, association, or individual including, but not limited to, insurance companies and investors that the Government contends the co-conspirators allegedly schemed to defraud;

M. With respect to paragraph 13 that purports to identify certain acts and documents generated in furtherance of the conspiracy, we request that you (i) identify each and every allegedly false claim submitted and/or filed as part of the conspiracy, (ii) identify each allegedly false document used in the conspir-

acy, (iii) identify all documents allegedly sent, delivered, deposited, taken or received as part of the conspiracy, (iv) identify all "writings, signs, signals, pictures and sounds" transmitted by means of wire communication in interstate commerce in furtherance of the conspiracy.

(Affidavit of Michael Berger, dated April 1, 2002, at ¶ 33, Ex. H.) The Government opposes Defendants' motion on the grounds that:

every Empire file that the Government has reviewed contains evidence of fraud. Because of the pervasive fraud, at this time, the Government intends to introduce some form of evidence as to *each and every* viatical file that Empire maintained. Accordingly, a bill of particulars will not narrow the proof the Government intends to offer against the defendants.

(Government's Response to Defendants' Joint Omnibus Pretrial Motions ("Opp.Mem."), at 26 (emphasis in original).) Instead, the Government promises to provide, one month before trial, a chart containing the names of the viators, investors and insurance companies at issue.[6] (*See id.*)

The decision of "whether to grant a bill of particulars rests within the sound discretion of the district court." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990) (internal quotations omitted). The purpose of a bill of particulars is to enable a defendant to prepare for trial, avoid surprise and permit a claim of double jeopardy. *See United States v. Nachamie,* 91 F.Supp.2d 565, 570–71 (S.D.N.Y. 2000) (citing *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987)).

Certain pointers exist to guide the exercise of the Court's discretion. A bill of particulars is not appropriate where it would merely disclose the government's trial strategy because that would "do little more than unduly restrict the government's proof at trial." *United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y. 1983). Thus, a bill of particulars is required "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused" but "is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) (internal quotations omitted).

Defendants urge the Court to grant a bill of particulars for the same reasons set forth in *Nachamie,* 91 F.Supp.2d at 565. In *Nachamie,* a prosecution for Medicare fraud conspiracy, the Government produced over 200,000 papers regarding 2,000 Medicare claims. The indictment did not clearly identify the respective roles of the eight defendants, and, although it "specifie[d] five ways in which the claims were falsified, no claims [were] identified by defendant, type of falsity, claim number and date." *Id.* at 571. The Court found the Government's promise to provide summary charts, among other things, sixty days prior to the trial inadequate to enable the defendants to prepare for trial, avoid surprise and permit a plea of double jeopardy. *See id.* at 571–72. The court's analysis considered factors including: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise had provided adequate notice of the par-

---

**6.** Such a chart would summarize and organize the information the Government already provided Defendants as notations accompanying the individual files the Government provided as part of its Rule 16(a)(1)(C) production.

ticulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Governments's investigation. *See id.* at 573. The court ordered the prosecution to provide the names of any known, unindicted co-conspirators, and identification of relevant dates for, who allegedly prepared and submitted, and what was false or misleading on, each claim and patient file document the Government intended to introduce at trial. At the same time, it summarily denied the defendants' request for a bill of particulars specifying: (1) the date that each conspirator joined the alleged conspiracy; (2) the names, addresses and dates of doctors and offices under whose names claims were submitted; (3) the date, time, persons and method involved in each overt act alleged in the indictment and meeting allegedly held in furtherance of the conspiracy. These denied requests sought what the *Nachamie* court determined to be an impermissible level of evidentiary detail. *See id.* at 575–76.

This Court finds that the analysis employed in *Nachamie* applicable to the instant case. Considering the large number of co-conspirators indicated in the Tortorella Affidavit and unspecified number of co-conspirators alluded to in the Indictment, the first *Nachamie* factor weighs in favor of Defendants. According to the Indictment, the conspiracy lasted over four years, from an unspecified point in 1996 to April, 2001, and it also appears from the Indictment that the Scheme was wide ranging. As such, the second *Nachamie* factor weighs in favor of the request.

Considering the third factor, this Court already found the Indictment to provide fair notice under Rule 7(c) and the Constitution. Preparing for what is expected to be a six week trial, however, is another matter. To better evaluate that task, the Court turns to the fourth factor. The volume of pretrial disclosure is significant, amounting to approximately forty-nine banker's boxes containing over 100,000 documents, in addition to audiotapes and possibly other disclosures. Mitigating the size of the production, however, is that the Government produced the documents in an orderly fashion, organizing individual files to identify the viator, insurance company and investor. Furthermore, the Government indicated that each file reveals fraud, and that the Government intends to introduce each file at trial. By implication, then, the viators listed on all the files are people diagnosed with HIV with whom Defendants arranged to viaticate fraudulent policies. Thus, the Government already has provided answers to Defendants' requests E and F. Likewise, by implication, the Government has provided information on the false claims and investors it puts at issue, thereby answering Defendants' requests J and M. Thus, the third and fourth factors weigh against finding a bill of particulars necessary, even if the information would be helpful.

The fifth *Nachamie* factor weighs in favor of granting the Defendants' request because there is no suggestion of danger to the confidential witnesses or co-conspirators should their identities be revealed. Finally, considering the sixth factor, when the trial date is imminent, as now, the Government's investigation presumably is close to completion. Thus, there is no indication that a bill of particulars will harm the progress of the investigation.

As such, taking account of the criteria considered in *Nachamie*, this Court regards some of the information Defendant's request to be necessary to the preparation of their defense. In particular, the Government should provide the Defendants with the names of unidentified co-conspira-

tors referred to in paragraphs 9 through 12 of the Indictment unless the Government, with regard to any particular co-conspirator, demonstrates by convincing evidence that disclosure would place such person in substantial danger, or that the disclosure otherwise would be significantly prejudicial to the orderly prosecution of the Government's case. The Government should also indicate which viators it contends were "recruited" by Defendants. The remaining items in Defendant's proposed bill of particulars request such a detailed description of the Government's case that the Government would be unduly restricted at trial. For this reason this portion of the request is denied. *See Wilson,* 565 F.Supp. at 1438.

### 2. *Request for an Exhibit List*

█ Defendants request a listing of the exhibits the Government intends to introduce at trial in order to "avoid surprise and gamesmanship where the charges involve voluminous discovery." (Def. Mem., at 28.) Defendants do not claim that the Government has engaged in such tactics, to date. The Government opposed the request, on the grounds that it has not engaged in such tactics, that Rule 16 does not require or authorize such production and that "the cause of the large number of incriminating documents is the defendants, not the Government." (Opp. Mem., at 33.) The Court, of course, disregards the Government's last point because it makes unwarranted assumptions at this point regarding the Defendants' culpability.

Rule 16(a)(1)(C) provides that the Government must provide for the discovery of documents in its possession or control that, *inter alia,* "are intended for use by the government as evidence in chief at trial." In *United States v. Turkish,* 458 F.Supp. 874, 882 (S.D.N.Y.1978), the Government was ordered to identify the documents it intended to use at trial because the 25,000 documents it produced merely "bur[ied] the defendant in paper." Similarly, in a complex tax evasion case, "where all concede that a significant number of documents have been produced by the government and will presumably be used at trial, it is right to narrow the field before trial in order to allow more effective case preparation by the defense." *United States v. Feldman,* 731 F.Supp. 1189, 1200 (S.D.N.Y.1990) (ordering production of exhibit list 14 days prior to trial); *see also United States v. Turkish,* 458 F.Supp. 874, 882 (S.D.N.Y.1978).

However, such an order is not required by statute and, if considered at all, may rest within the district court's discretion. Many courts in this District, concerned by the absence of controlling authority that clearly authorizes such a pre-trial order, have declined to order production of an exhibit list prior to trial. *See, e.g., United States v. Valerio,* 737 F.Supp. 844, 847 (S.D.N.Y.1990); *see also Nachamie,* 91 F.Supp.2d at 569–70.[7]

Although the requested discovery is not specifically authorized, the Court finds that Defendants' request is reasonable because of the numerous documents and alleged participants in the relatively complex Scheme. The Court's main concern in this regard is that Defendants be afforded a fair trial and that the presentation of both the Government's and Defendants' cases

---

7. Although the *Nachamie* court denied one defendant's request that the Government identify which documents already produced it intended to introduce in its case in chief as beyond the scope of Rule 16, it ordered further briefing on another defendant's request for an "exhibit list." It is not clear to the Court what distinction the *Nachamie* court drew between the defendants and their requests.

be orderly. The interests of justice and fair play thus mediate in favor of the Government providing Defendants, as an aid in preparation for trial, with more detailed disclosure of exhibits it anticipates introducing at trial. Accordingly, the Court orders the Government to produce a working copy of its exhibit list one week prior to trial, unless the Government, as to any particular document, demonstrates by convincing evidence that disclosure may endanger any witness or other person or would otherwise be significantly prejudicial to the orderly prosecution of the Government's case.

### 3. *Request for Early Production of F.R.E. 404(b) Disclosures*

Defendants request a two month notice period for material the Government contemplates introducing under Federal Rules of Evidence 404(b). Rule 404(b) obligates the Government to provide "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." "Reasonable notice" is not defined by the statute; courts in this Circuit have held two to three weeks notice sufficient, but a longer period may be appropriate depending on the circumstances. *See Nachamie*, 91 F.Supp.2d at 577 ("a longer notice period is appropriate [where there is an] absence of any threat to the safety of prospective witnesses and the ... Rule 404(b) evidence [is important to] this action") (quoting *United States v. Livoti*, 8 F.Supp.2d 246, 250 (S.D.N.Y.1998)). The Government anticipates providing the Defendants with the 404(b) materials "at least two weeks days", which the Court construes to mean fourteen calendar days, prior to trial.

 Here, Defendants have not identified circumstances warranting early pro-

duction of Rule 404(b) materials. Obviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial. But the test concerns whether the evidence has particular importance in the action and whether there is any threat to the safety of prospective witnesses. While there is contention that no witness will be placed in jeopardy, Defendants have not shown why a longer period of time is necessary in this case. Thus, the rules do not require early production of Rule 404(b) materials. Nonetheless, the Court notes that the sheer number of defendants and nature of the allegations make Defendants' task of trial preparation time-consuming, and directs the Government to provide the Defendants with Rule 404(b) materials not later than two weeks prior to trial, as is typically considered sufficient in this Circuit.

### 4. *Request for Additional Audiotape Evidence*

Defendants request copies of audiotapes reflecting conversations consensually recorded between any of the alleged co-conspirators, including the Defendants. The Government has already produced audiotape recordings of the Defendants' conversations with persons who consented to have the conversations recorded, as well as some recordings of co-conspirators of the Defendants made during the course of the Government's investigation of Defendants. The Government argues it need not produce the remaining audiotape evidence, which consists of "conversations between confidential witnesses and individuals other than the defendants that the Government does not intend to introduce at trial." (Opp. Mem., at 35.)

 The Government's obligation to provide statements made by co-defendants and co-conspirators is set forth in

the Jencks Act, codified at 18 U.S.C. § 3500.[8] Section 3500 "provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *In re United States v. Coppa*, 267 F.3d 132, 145 (2d Cir.2001). Thus, district courts are prohibited from ordering the pre-trial disclosure of such statements. *See id.* (citing *In re United States*, 834 F.2d 283, 286–87 (2d Cir.1987) and *United States v. Percevault*, 490 F.2d 126, 131 (2d Cir.1974)). Of course, such prohibition falls away should it conflict with the Government's obligation to produce exculpatory material pursuant to the Fourteenth Amendment and as expressed in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See id.* at 146. Furthermore, the limitations of § 3500 apply only to statements made by co-conspirators whom the government intends to call as witnesses. *See Percevault*, 490 F.2d at 131–32.

The Defendants attempt to avoid the statutory bar by arguing that the large number of tapes warrants an exception to the Jencks Act. The Defendants argue that nondisclosure would be unfair to Defendants because it does not facilitate preparation for trial. Specifically, Defendants are concerned with preparing for the audibility and authentication issues involved in introducing audiotape evidence, the possible need to transcribe audiotapes for use at trial as well as the logistical difficulties involved in listening to numerous audiotapes over an abbreviated period of time. These inconveniences do not cause any harm of constitutional magnitude and thus do not require the Court to order disclosure. Based on the Government's representation to the Court that it does not intend to introduce any of the confidential

witnesses or other individuals recorded on the unproduced audiotapes, the Court denies Defendant's request.

### 5. *Request for Witness List*

As the Government points out, Rule 16 does not provide defendants with the right to obtain a list of the Government's witnesses. Nevertheless, the district court has discretion to order such disclosure upon a finding that a defendant's request is material to the preparation of his case and upon a specific showing of such materiality and reasonableness. *See United States v. Cannone*, 528 F.2d 296, 300–01 (2d Cir.1975) (denying "abstract, conclusory claim that such disclosure was necessary" to defendant's preparation for trial); *Nachamie*, 91 F.Supp.2d at 579. Courts in this District often assess materiality and reasonableness of the request through the application of the six-factor test set forth in *Turkish*, 458 F.Supp. at 881. *See, e.g., United States v. Washington*, 947 F.Supp. 87, 89 (S.D.N.Y. 1996). The *Turkish* factors ask: "(1) Did the offense alleged in the indictment involve a crime of violence? (2) Have the defendants been arrested or convicted for crimes involving violence? (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)? (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial? (5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' case complex and difficult? (6) Do the defendants have limited funds with which to

---

**8.** By contrast, F.R.C.P. 16 provides that the Government provide for the discovery of "any relevant written or recorded statements made by the defendant."

investigate and prepare their defense?" *Turkish*, 458 F.Supp. at 881.

■■■ The Court's application of the *Turkish* factors weighs in favor of granting Defendants' request. The offense in the Indictment does not involve a crime of violence, nor have the Defendants been arrested or convicted for any violent act. Both the Defendants and Government have indicated that the trial will be document-intensive. There is no contention that providing a witness list to Defendants will decrease the likelihood that listed witnesses will appear at trial. Given the nature of the charges and evidence, as well as the fact that all four Defendants are to be tried simultaneously, the Court is aware that Defendants' preparation for trial will be time-consuming. Considering the final factor, Defendants claim to lack the funding to interview each potential witness in the case. Potentially, if the Government identified 84 participants in the Scheme in addition to the Defendants, Defendants would need to interview at least 84 individuals as potential witnesses. Thus, each factor weighs in favor of production of a witness list. The Court orders the Government to produce a witness list to Defendants not less than thirty days prior to trial, unless the Government, as to any particular witness, demonstrates by convincing evidence that such disclosure may endanger the witness or increase the likelihood that such witness will not appear at trial, or that disclosure otherwise will be significantly prejudicial to the orderly prosecution of the Government's case.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that Defendant's motion to dismiss the Indictment is denied; and it is further

**ORDERED** that Defendant's request for a bill of particulars is granted to the extent that not less than one month prior to trial the Government shall provide the Defendants with the identities of the unidentified co-conspirators referred to in paragraphs 9 through 12 of the Indictment and identify which viators it believes were recruited, unless the Government, with regard to any particular co-conspirator, demonstrates by convincing evidence that disclosure would place such person in substantial danger, or that the disclosure otherwise would be significantly prejudicial to the orderly prosecution of the Government's case. Defendants' request is denied in all other respects; and it is further

**ORDERED** that Defendant's request for early production of Rule 404(b) materials is denied but that the Government shall make its production pursuant to Federal Rule of Evidence 404(b) not less than two weeks prior to trial; and it is further

**ORDERED** that Defendant's request for production of an exhibit list is granted to the extent that the Government provide a working copy of its list of exhibits it intends to introduce as part of its case in chief not less than one week prior to trial unless the Government, as to any particular exhibit, demonstrates by convincing evidence that disclosure might endanger any witness or other person or would otherwise be significantly prejudicial to the orderly prosecution of the Government's case; and it is further

**ORDERED** that Defendant's request for production of additional audiotape evidence is denied; and it is further

**ORDERED** that Defendant's request for a witness list is granted and that the Government shall produce a witness list to Defendants not less than thirty days prior to trial unless the Government, as to any particular witness, demonstrates by convincing evidence that such disclosure may

endanger the witness or increase the likelihood that such witness will not appear at trial, or that disclosure otherwise will be significantly prejudicial to the orderly prosecution of the Government's case; and it is finally

**ORDERED** that the defendant Baiocco appear before this Court for an evidentiary hearing concerning the pre-arrest statements he made to government agents on Wednesday, August 21, 2002 at 3 p.m.

**SO ORDERED.**